Peelle, J.,
delivered the opinion of the court:
Judgments were rendered in these cases January 11,1893, on an agreed stipulation under section 4 of the Indian depredation act, March 3,1891 (26 Stat. L., 851; 1 Supp. Rev. Stat., 2d ed., p. 913). But the defendants within the time allowed under Revised Statutes, section 1088, filed motions for a new trial, which, after elaborate argument, were granted and the cases were subsequently reargued.
The claimants seek to recover, as alleged in their respective petitions, for depredations committed by the Ogalalia band of the defendant Indians on the 12th September and the 28th October, 1866, and in support of their right to recover they in the main rely on the findings of the court on the question of amity of the Ogalalia band of Sioux Indians heretofore made in the Leighton cases.
In the Leighton Case (29 C. Cls. R., 288) the court found that these Indians were in amity with the United States on the 30th June, 1866, for the reasons stated in the opinion of the court, beginning at page 326.
Reference is there made to the Report of the Commissioner of Indian Affairs, which is set forth in Senate Ex. Doc. No. 13, first session Fortieth Congress, page 2, from which it appeals that the massacre of the friendly and helpless Cheyenne Indians at Sand Creek, Colorado, in December, 1864, precipitated a general war among the Indians, which “embraced all the tribes of the Plains from the Red River of the South to the Red River of the North, and resulted in the general Indian war of 1865, which cost our people many valuable lives and $40,000,000 in money.”
But from this same report it appears that “ peace was concluded with all the southern tribes in October, 1865. Peace was likewise made with the Missouri River Indians late in the same autumn, and the Indians engaged in the recent hostilities (Sioux) gave notice that they also were willing to bury the tomahawk.”
*444 Following tbis a treaty was negotiated at Fort Sully, October 28, 1865, with various bands of the Sioux Indians, including the Ogalallas, which latter treaty was ratified by the Senate with an amendment, as provided might be done by article 6 thereof, and the treaty was proclaimed by the President March 17,1866 (14 Stat. L., 747).
This treaty was objected to by the defendants on the trial of the Leighton Case (supra), because it had been signed by only three Indians — headmen or chiefs — and that they were not authorized to act in that capacity for the band, and further that those who signed the treaty were induced to do so by undue influence.
But this court, following the decision in the case of Fellows v. Blacksmith (19 How., 366, 372) and authorities there cited held, that “ when a treaty has been executed and ratified by the Senate and proclaimed by the President courts will presume that such treaty was lawfully made.”
Although the annuities of $10,000 per annum provided for by article! of this treaty were appropriated by Congress from July, 1866, to July, 1868 (14 Stat. L., 274, and 15 Stat. L., 216), and until the treaty of April 29, 1868 (15 Stat. L., 635), the Indians were dissatisfied with the treaty, or rather the manner in which they claimed it was procured and signed, and steps were taken to negotiate another treaty, which should contain the signatures of the leading chiefs, and particularly that of Bed Cloud, who was the leader of the hostiles.
The Indians themselves manifested a desire for peace, as will be seen in the following extract from the Keport of the Secretary of the Interior for 1S66 and 1867, in which he says:
“In February, 1866, a deputation of Indians representing the Sioux, by far the most numerous and powerful of these tribes, reached Fort Laramie, and through an interpreter communicated with Col. Henry E. Maynadier, then, as now, in command of the district in which that important military post is situated. They represented to Colonel Maynadier that their tribes were in a condition of utter destitution, without food, and scantily supplied with clothing; that their blankets were worn out, their horses and ponies nearly all dead, and that their young men were tired of war and desired the reestablishment of peace. Colonel Maynadier listened patiently to the story of their destitution and sufferings and assured them-that the Government was earnestly desirous that terms of peace *445 and friendship should be reestablished. Provisions and tobacco were issued to them and they returned to their tribes.
“Early in March several of the chiefs, with portions of their bands, arrived at Fort Laramie, and a telegraphic correspondence was held between them and the undersigned, who had during the preceding winter been appointed by the President a member of the Commission to negotiate, if practicable, terms of peace. In that correspondence (a full report of which was at that time forwarded to the Indian Department at Washington) it was agreed on the part of the chiefs that all hostile action on the part of the bands which they represented should be suspended until the fixed time for the assembly of the Peace Commission at Fort Laramie on the 1st of June following. This agreement was faithfully observed by the Indians and no depredations were committed by any of the lately hostile bands.”
Referring to the treaties which were negotiated by the Peace Commission at this time it is stated in Senate Ex. Doc. No. 13 (supra) (pp. 3-61) that—
“The only one of the Prairie Sioux who remained and agreed to abide by the treaties were the Lower Brules, with a few stragglers from the other tribes. At that time they numbered about 2,500, but a year later, June, 1867, Spotted Tail, Standing Elk, and Swift Bear, the treaty chiefs, had with them only ten lodges, mostly of old men and squaws, the young men having gone to swell the ranks of Red Cloud. So rapid was the defection of warriors to the hostile camp that within two weeks after the passage of the troops Spotted Tail and Standing Elk told the whites that their young men had left them and gone to the Powder River country, and that parties who went far from home had best go prepared and look out for their hair.” (See Massacres of the Mountains and Senate Ex. Doc. No. 13, pp. 3 and 61.) •
This was in June, 1866, and the refusal of Red Cloud to become a party to the treaty ceding the right of way for the Montana road and the establishment of military posts, rallying around him the warriors from other bands, with notice to the whites from Spotted Tail and Standing Elk, “that their young men had left them and gone to the Powder River country, and that parties who went far from home had best go prepared and look out for their hair,” was certainly an indication that the Ogalalla Indians, led by Red Cloud, were preparing for war.
Had the notice referred to been given by Red Cloud, who was then in command of the hostiles, it might be construed as *446 a declaration of war. But as it was we regard the course of these defendant Indians at that time as a mere preparation for war without any definite hostile act toward the United States until after June 30,1866.
This conclusion we reached in the Leighton Case (supra) relying mainly upon the reports of Col. Henry B. Carrington, United States Army, who was then in command of the military forces of what was known as the “Mountain district,” wherein the defendant Indians were located and roamed.
In another of the Leighton cases, No. 821, where no opinion was given, the court found, after a less elaborate argument than now confronts us, that the defendant Indians were in amity with the United States on the 7th of September, 1866.
The elaborate arguments and briefs made and filed since that case was decided convince us that we committed an error in finding that the Ogalalla band of the Sioux Indians was in amity with the United States at that time.
We will briefly review the situation, covering the period of these depredations, as well as those in the Leighton eases (supra).
May 19, 1866, General Carrington, in conformity with his instructions as stated in Senate Ex. Doc. No. 33, first session* Fiftieth Congress, page 2, to establish military posts along what was known as the Bozeman or Montana route, extending from Fort Reno to Virginia City, proceeded with his command from Fort Kearny, Nebr., reaching Fort Laramie June 14 following.
Two days later he proceeded with his command to Fort Reno, a post which had been established the year before, formerly known as Fort Connor, reaching there June 28, and in reporting his arrival there, among other things, said: “No Indians were met en route. * * * The command came through in good order.”
July 10 following he moved with his command westward, and by July 15 had surveyed and occupied the position after-wards designated as Fort Phil Kearny, about 40 miles from Fort Reno, and in the heart of the Indians’ hunting ground.
As stated in the opinion of the court in the first of the Leighton cases (supra), “the Indians manifested no objection to the occupation of old Fort Reno by the military authorities,” saying that if they (the white soldiers) would go back to *447 Powder Elver (Fort Eeno), a fort of last year, tbe white soldiers might stay there, but should build no new forts.
July 15 General Carrington says: “ Up to this no attack had been made upon my command or any of its trains.”
So we may safely conclude that while the Indians were hostile in feeling, no acts were committed prior thereto in furtherance of their preparation and purpose to resist the military authorities in the establishment of the posts referred to.
But the removal of the troops westward from Fort Eeno appears to have been regarded by the Indians as a declaration or act of war, and they were ready to respond.
Having given notice of their opposition to any encroachment upon their hunting grounds westward from Fort Eeno, they, on July 17, attacked the trains of Brevet Major Haymond, passing his picket and driving away 174 head of stock.
In his efforts to regain his stock, Haymond was surrounded by 300 Indians, and though having been reenforced by 50 mounted men and two companies of infantry, he deemed it best to abandon pursuit. He lost two men killed and three wounded (p. 10). (Senate Ex. Doc. 33, supra.)
Here the previous preparations and expressed purpose ol the Indians were manifested not only by the attack upon, but by their resistance to, the military authorities, and was evidently with the consent of the band and its chief, Eed Cloud.
Standing alone, the court might be justified in viewing'this attack in a different light, but when considered in connection with the refusal of Eed Cloud to become a party to the Laramie treaty, and with the numerous subsequent attacks upon military and other trains, and the killing of many officers and men and citizens, and the stealing of Government and other stock, as set forth in the documents referred to, the court must conclude that the purpose of the Indians was war and not plunder — not depredations; and so we fix the date of the beginning of hostile acts as July 17, 1866.
General Sanborn, who was appointed to investigate the condition of these and other Indians at- that time, in his report, among other things, says: ■
“During the time from July 26, the day on which Lieutenant Wand’s train was attacked, to the 21st day of December, on which Brevet-Colonel Fetterman, with his command of 80 officers and men, was overpowered and massacred, they killed 91 enlisted men and 5 officers of our army, and killed 58 citizens *448 and wounded 20 more. * * * During this time they appeared in front of Fort Phil Kearny, making' hostile demonstrations and committing hostile acts fifty-one different times, and attacked nearly every train and person that attempted to-pass over the Montana road.” (Senate Ex. Doe. 13, first session Fortieth Congress, pp. 61, 62.)
Here, it will be noticed, the attacks continued until December-21, 1866, at which time the command of nearly 100 men and officers under Lieutenant Fetterman were all massacred; but prior to the dates of the depredations alleged in this case the-attacks were numerous, extending up to the very time of the depredations complained of.
These attacks continued without material abatement until December 21, 1866, and thereafter, and embraced, as conceded by counsel on both sides, the Ogalalla, Minneconjou, Brules, and Two Kettles bands of the Sioux Indians, if indeed other bands were not engaged in the same acts of hostility; but we will not enlarge the number, as it is alleged in the several petitions that the depredations were committed by the Ogalalla Sioux.
The Commissioner of Indian Affairs, on February 4, 1867 (Senate Ex. Doc. 13, supra, p. 9), says:
“Nevertheless, there is a band of Sioux Indians in that country, of the Ogalalla tribe, headed by a chief of the name of Red Cloud, that are badly disposed. This is the only band, so far as I am informed, that is hostile as a band; but I have no doubt that around him and under his banner are gathered all the badly disposed Indians of the country. They flock to his standard as individuals, not as tribes, and I think this band, with its adherents, should be severely chastised by the military.”
From the reports'which we have cited it appears clear to us that the band of Ogallala Indians were not in amity with the United States at the time of the several depredations in September and October, 1866, and that such hostility commenced July 17, 1866.
It follows that the court is without jurisdiction, and it is therefore unnecessary to consider any other question raised by the defendants.
The petition is dismissed.
RichardsoN, C. J., was present when these cases were argued and concurred in the conclusion of the court, but died before the decision was announced.