Peelle, J.,
delivered the opinion of the court :
Judgment was rendered in this case against the United States and the Apache Indians December 5, 1892, for $15,215 on an agreed stipulation under the provisions of section 4, Indian depredation act March 3, 1891 (26 Stat. L., 851).
On December 4,1894, the defendants filed their motion for a new trial under the provisions of Eevised Statutes, section 1088, setting forth that “ in the award of said judgment wrong and injustice was doné the United States in this, that—
u (1)' The record does not show and the evidence does not prove that Esteban Ochoa, the deceased partner of the claimant, was a citizen of the United States at the time of the alleged depredation.
“ (2) Suit may not be maintained against the Apache Indians generally.
“ (3) The depredations alleged were not committed by the Apache Indians.
“(4) At the time of the alleged depredations the Gila Apaches, who committed the depredations, were not in amity with the United States.
“ (5) The Secretary of the Interior had therefore no authority to allow the claim in any sum.
*3 “ (6) Tbe Assistant Attorney-General was therefore not authorized to stipulate for judgment in any sum.
“ (7) The Court of Claims was without jurisdiction to render judgment on the stipulation filed.”
On the argument of the case the citizenship of Esteban Ochoa, the deceased partner, was conceded by the defendants’ counsel, and we think rightly, as the admitted evidence sufficiently establishes that fact, as well as the citizenship of Tully.
As to the second ground assigned for a new trial, i. e., that “suit may not be maintained against the Apache Indians generally,” that question was settled in the Graham Case (30 C. Cls. R., 318) as to the Sioux Indians, which decision was rendered since the filing of the defendants’ motion herein.
That case differs, however, from the one at bar in this, that the bands of the Sioux Indians who united in the last treaty with the Sioux as a nation (15 Stat. L., 635) were also under separate treaty relations, while in the case at bar the different bauds of the Apache Indians were never under separate treaty relations. But we will discuss this difference further along.
The depredations were committed, as alleged in the petitions, on the following dates, viz: September 1,1867, in New Mexico, near the Mimbres, a rivulet about 200 miles east of Tucson, Arizona Territory, and July 22,1868, at Ciénega de los Pinos, 35 miles southeast of Tucson; May 11, 1869, at Canyon del Oro, 30 miles northeast of Tucson, and December 18, 1870, about 40 miles east of Tucson, in Arizona Territory.
The total loss claimed was $21,520, while the total allowance by the Secretary of the Interior Department was $15,215, as follows:
Eor the depredation of September 1, 1867. $3,150
Eor the depredation of July 22,1868 . 3,170
Eor the depredation of May 11, 1869. 7,225
Eor the depredation of December 18, 1870. 1, 670
Making in the aggregate, as above stated. 15,215
The dates of tbe several depredations stated in the stipulation upon which the judgment was rendered are July 22,1868, May 11,1865, and December 18, 1870; but inasmuch as the judgment was rendered for the sum of $15,215, which included the allowance of $3,150 for the depredation of September 1, 1867, we conclude that the omission of that date from the stipulation, as well as stating one of the depredations as May *4 11,1865, when it should have been 1869, were clerical errors. Such was doubtless the view of counsel on both sides, as they treat the depredations as having been committed on the several dates first stated.
So that the amity of the Indians on each of the dates — in 1867, 1868,1869, and 1870 — is essential to the validity of judgment.
It was conceded in the argument that if the band or tribe to which the depredating Indians belonged was at the time of the several depredations in amity with the United States, then the judgment rendered should not be disturbed.
Fully concurring in this view of the defendants’ counsel, we will proceed to consider the questions (1) as to what particular Indians committed the depredations; (2) what was their political status in relation to the United States, and (3) was the band or tribe to which such Indians belonged in amity with the United States at the time of the several depredations set forth in the claimant’s petition and for which judgment was rendered.
The defendants contend that the several depredations were committed by the Gila (Gileno) tribe of Apache Indians, and that as this tribe constitutes but a small portion of the Apache nation, it was an error to render judgment against the Apache Indians generally.
The contention of the claimant is that although the depredations were committed by particular bands of Apache Indians, still the Apache nation as such is alone responsible therefor, because it is the only political or tribal body recognized by the United States by treaty, no separate treaties having been entered into with the different tribes or bands comprising the nation.
We think the evidence in this case clearly establishes the facts, as conceded by the claimant’s counsel, that the first depredation was committed by the Mimbres (Mímbrenos) band of Gila Apache Indians in the vicinity of their home near the Mimbres, a rivulet in New Mexico some 200 miles east of Tucson, Ariz., and that the three other depredations were committed within 40 miles southeast, northeast, and east of Tucson, Ariz., by the Arivaipa band of Apache Indians, which band the defendants say was perhaps also a part of the Gila tribe.
So that while the claimant concedes that the depredations were committed by a less subdivision of the Apache nation *5 than the defendants do, still both parties practically concede that the Indians committing the depredations belonged to the Gila tribe of Apache Indians.
In speaking of the subdivisions of the Apache nation, the defendants in their brief say, “The Apaches are a race or people having many separate and distinct tribes, themselves independent organizations, located at different agencies or reservations, and enjoying annuities and receiving rations to suit their various wants.”
That statement is in harmony with the report of the Director of the Bureau of Ethnology for 1885-86 (pp. 55, 56), wherein it is shown that the Apache Indians belong to the Southern Group of the Athapaskan family, numbering 23,409, making their homes in Colorado, Arizona, and New Mexico, and being subdivided into the following principal tribes: Arivaipa, Chi-ricahua, Coyotero, Faraone, Gileño, Jicarilla, Lipan, Llanero, Mescalero, Mimbreño, Mogollon, Naisha, Navajo, Pinal Coyo-tero, Tchíkún, Tchishi.
At the time of that report, as therein stated, the tribes were grouped together on reservations and separately numbered as follows:
Southern Group, consisting- of Apache, Lipan, and Navajo:
Apache children at Carlisle, Pa. 142
Apache prisoners at Mount Yemon Barracks, Ala. 356
Coyotero Apache (San Carlos Reservation). 733?
Jicarilla Apache (Southern Ute Reservation, Colo.). 808
Lipan with Tonkaway, on Oakland Reserve, Ind. T. 15?
Mescalero Apache (Mescalero Reservation, N. Mex.). 513
Na isha Apache (Kiowa, Comanche, and Wichita Reservation, Ind. T.). 326
Navajo (most on Navajo Reservation, Ariz. and N. Mex. : 4 at Carlisle, Pa.). 17,208
San Carlos Apache (San Carlos Reservation, Ariz.). 1,352?
White Mountain Apache (San Carlos Reservation, Ariz.). 36
White Mountain Apache (under military at Camp Apache, Ariz.). 1,920
Total. 23,409?
The Arivaipa Indians are doubtless grouped in the above list with the White Mountain or San Carlos Apache Indians, located on the San Carlos Eeservatiou.
From this same report it appears that the Northern Groups of the same family, consisting of 14 principal tribes and numbering about 8,595, made their home in British North America, while the Middle or Pacific Group, consisting of 23 principal tribes and whose number is indefinite, made their homes in California and Oregon.
*6 It is true that in. the making of treaties the United States have recognized the Apache Indians, “ situate and living within the United States,” as a nation, as shown by treaty of July 1, 1852 (10 Stat. L., 979), and this was the treaty cited and relied upon by the Secretary of the Interior as charging the defendant Indians with the depredations committed.
Three other treaties were subsequently negotiated with the Apache Indians inhabiting the Indian Territory “south of the Arkansas,” and of these the defendants say:
“ There is also a considerable body of Apaches confederated with the Kiowas and Comanches in 1867 by the terms of the Medicine Lodge treaty, and living on a reservation in the Indian Territory at the time of these depredations, more than 500 miles from the locality in which they occurred.
“ So distinct is this body of Apaches from others of the tribe that they were as a body, in 1853, confederated with the Kiowas and Oomanches by the terms of the treaty to be found in 10 Stat. L., 1013; in 1865 they were, at their own request, transferred bodily from the Kiowas and Comanches to the Cheyennes and Arapahoes (14 Stat. L., 713), and again, in 1867, confederated by the Medicine Lodge treaty with their former allies, the Kiowas and Oomanches.” (15 Stat. L., 589.)
These treaties were evidently with a lesser number of Indians than were included under the first treaty, but the material point is that the United States have not by treaty recognized the separate bands comprising the Apache nation, and particularly those bands committing the depredations in this case, and this we understand is not controverted by the defendants.
Their contention is that the recognition of such separate bands in the reports of the officials having authority in respect thereto is such recognition by the political departments of the Government as to charge them separately under the act of 1891 {supra) for depredations committed.
Section 6 of the act provides how the amount of any judgment rendered “ shall be charged against the tribe by which or by members of which the court shall find that the depredation was committed, and shall be deducted and paid.”
(1) From annuities; (2) from funds arising from the sale of any lands; (3) from any appropriation for their benefit other than for their current and necessary support and education; (4) if all these fail, then from the Treasury of the United States.
*7 And if so paid from the Treasury, the same “shall remain a charge against such tribe and shall be deducted from any annuity, fund, or appropriation hereinbefore designated which may hereafter become due from the United States to such tribe.”
These provisions, taken in connection with the jurisdictional section of the actj we think clearly indicate that Congress did not intend to limit the liability for depredations simply to those tribes, bands, or nations that sustained treaty relations with the United States.
This was the view taken in the Graham Case (supra), wherein the court said, “Not that Indians under treaty relations only are suable under the act of 1891, but that by such treaties the relations of the Indians in their organized or tribal capacity is thereby fixed and recognized” (Kansas Indians, 5 Wall., 737). And when so fixed and recognized, the courts are bound by it.
If, as claimant contends, the G-overnment can recognize Indians in their tribal capacity only by treaty, and that the political entity thus treated with is alone responsible for depredations committed by its members, then, carried to its logical conclusion, none but Indians under treaty relations would be suable under the act of 1891.
When a treaty has been signed on the part of a nation or tribe of Indians by more than one chief or headman, as was done in the case of the treaties with the defendant Indians, it is probable that such chiefs and headmen represent different subdivisions of such tribe or nation, though such subdivisions be not recognized by separate treaties.
The policy of the United States in dealing with the Indians has been, as we understand, to accept the subdivisions of the Indians into such tribes or bands as the Indians themselves adopted, and to treat with them accordingly.
' So that if such subdivisions, whether into tribes or bands, have not been recognized by treaty, but have been by the officers of the G-overnment whose duty it was to report in respect thereto, then the court will accept that as sufficient recognition of the tribe or band upon which to predicate a judgment.
Or if there be no such recognition by the Government, then the court will accept the subdivisions into such tribes or bands as made by the Indians themselves, whether such bribes and *8 bands be named by reason of their geographical location or otherwise.
If a number of Indians with a chief or headman make their home in the vicinity of the Mimbres Eivulet in New Mexico or on the Arivaipa Greek in Arizona, as a tribe or band, as in the case at bar, that is sufficient to identify them in the absence of any other name, and particularly when they are a part of a common family whose general or family name is known.
Therefore when the court has ascertained that a depredation has been committed by Indians belonging to some tribe, band, or nation in amity with the United States, whether such tribe, band, or nation has been recognized as such by treaty or otherwise, the act of 1891 applies and the court has acquired jurisdiction to adjudicate the claim as therein provided.
In the case at bar, however, the defendants have cited numerous reports of officers connected with Indian affairs made long before and subsequent to the dates of the depredations herein, showing recognition by the Government of various bands and tribes belonging to the Apache nation of Indians, among which is the Mimbres band, which, together with other bands, including, as defendants say, “perhaps the Arivaipas, are known under the Territorial designation,- Gila Apaches.”
And the subdivisions thus recognized by the officers of the Government are substantially the same as those recognized by Schoolcraft in his History of the Indian Tribes, volume 5, pages 206-208.
These subdivisions will be recognized by the court in considering the question of amity.
Again, inasmuch as the jurisdictional section of the act recognizes bands, tribes, and nations in the commission of depredations without reference to their treaty relations, what we said in the Graham Case (supra) is applicable in this case:
“ Therefore, we think it clear that under the Indian Depredation Act, March 3,1891 (supra), suit may bejnaintained against - the Sioux Indians as a tribe or nation, and if in such suit the evidence should show that the depredation was committed by Indians belonging to such tribe or nation, without more particular identification, we think a judgment may properly be rendered against them as a tribe or nation.”
To that we may add that when a depredation has been committed by Indians belonging to a tribe or nation, and such *9 tribe or nation is made defendant in a suit tberefor without more particular identification, such tribe or nation, as well as the United States, can limit the liability by showing that such depredation was committed by Indians belonging to a particular band or tribe.
“ The nation can not be held liable for the illegal acts of the tribe, nor the tribe for the illegal acts of the band, when the Indians committing the depredation can be identified as belonging to a particular tribe or band.” Graham Case (supra).
By section 3 of the act a claiinaint is required to set forth in his petition, as near as may be, the particular Indians alleged to have committed the illegal acts, and in the taking of his proof he should exercise in good faith the same degree of diligence.
When he has done this, he has complied with the statute in these particulars. Following the decision in Graham’s Case (supra), if the court finds that the bands to which the depre-dating Indians belonged were at the time in amity with the United States, then the court will file an additional finding setting forth that fact for the information and guidance of the Department.
The final question is, Were the Mimbres and Arivaipa bands of Apache Indians in amity with the United States on the dates of the several depredations, viz, September, 1867, July, 1868, May, 1869, aud December, 1870?
The Commissioner of Indian Affairs, in his report for 1867 (p. 12), refers to the Mimbres and Mogollon bands of Gila Apaches as “ about the most troublesome Indians to be found anywhere,” and says they “have long been hostile and have committed many murders of citizens and frequent depredations.”
In speaking of these same Indians the superintendent in the same report (1867), at page 193, says:
“They have been for the last four years, ever since the Texas invasion, in open hostility against the people and the Government, and have been continually committing depredations and murders throughout the southwestern portion of this Territory (New Mexico). Even now scarcely a week or day passes but some one is a victim of their savage ferocity. In 1861 or 1862 they commenced their warfare against the whites, and have continued iu open hostility ever since. They then broke up the settlements on the Mimbres, murdered and scalped the *10 settlers who were unable to escape their vengeance by flight to places of safety in densely populated sections of the country. They drove off the miners and farmers from their mines and homes, and all that region of country in the neighborhood of Pinos Altos, where rich and valuable mines were successfully worked, which is one of the richest mineral regions in the known world for copper, silver, and gold, had to be abandoned on account of the savage and unrelenting warfare waged against its inhabitants by these Gila Apache Indians.”
Other reports are cited by counsel for this year, but as they bear specially on the condition of the Apache and other Indians in Arizona within the Military Department of the Pacific, we need not set them out here.
We have considered them in connection with other reports for this year showing the status of the Mimbres band of Gila Apaches in New Mexico, where the depredation of September 1,1867, was committed and where these Indians made their home, and we are satisfied that the hostility of this depre-dating band is correctly stated in the reports which we have set out above.
They show that this band of Indians had for years, and continuously up to the date of this depredation, been guilty, not only of numerous murders of citizens and the destruction of much property, but of scalping their helpless victims, “ who were unable to escape their vengeance,” driving the people from their homes and places of business by their “ unrelenting-warfare.”
This shows a most cruel and wanton destruction of life and property, not for a day nor for a week, but for years, and is akin to war, not peace.
With reference to such destruction of life and property this court, in Leighton’s Case (29 C. Cls. R., 288, 326), said: “Ill feeling may exist between such tribe and the citizens in a given locality with or without just cause on the part of such tribe, but unless such tribe resort to a wanton destruction of life and property the condition of amity on the part of such tribe toward the United States will not thereby be changed.”
Such also was the view of this court in the case of Carter & Crary et al. (31 C. Cls. R., 441, 447), where the court-said:
“ Here the previous preparations and expressed purpose of the Indians were manifested, not only by the attack upon but by their resistance to the military authorities,- and was evidently with the consent of the band and its chief, Eed Cloud.
*11 “ Standing alone the court might be justified in viewing this attack in a different light, but when considered in connection with the refusal of Red Cloud to become a party to the Laramie treaty, and with the numerous subsequent attacks upon military and other trains, and the killing of many officers and men and citizens, and the stealing of Government and other stock, as set forth in the documents referred to, the court must conclude that the purpose of the Indians was war and not plunder.”
In this view we are sustained by the Supreme Court in the Marks Case (161 U. S., 297, 304), where the court, in speaking of the construction of the act in this respect, said :
“We do not think this legislation is to be thus construed, and are of the opinion that all that Congress intended was that when, as a matter of fact, a tribe was in the relation of actual peace with the United States, and by some individual, or individuals, without the consent or approval of the tribe, a depredation was committed upon the property of citizens of the United States, such depredation might be investigated and the amount of the loss determined and adjudicated by the Court of Claims.”
Here the court construes the words “ in amity with the United States ” to mean that, “ as a matter of fact ” the tribe to which the depredating Indians belong was at the time of the depredation “in the relation of actual peace with the United States.” And this the court says is the inquiry we are to make, and if we find “ as a matter of fact the tribe was at the time, as a tribe, in a state of actual peace with the United States,” and “the depredation was committed by a single individual or a few individuals, without the consent and against the knowledge of the tribe,” that then “ the court may proceed to investigate the amount of the loss, and.render judgment therefor.”
On the other hand, the court says that if “ the tribe, as a tribe, was engaged in actual hostilities with the United States, the judgment of the Court of Claims must be that the allegation of the petition is not sustained, and that the claim is not one within its province to adjudicate.”
It is quite clear that the Mimbres band of Indians was not at the time of the depredation “in the relation of actual peace with the United States,” and that being the case the court might perhaps stop here without considering the question as to whether at the time “ the tribe, as a tribe, was engaged in *12 actual hostilities with the United States,” for unless “the relation of actual peace with the United States existed at the time there can be no recovery.”
As was said in the Leighton Case (supra), “ill feeling may exist” on the part of a tribe, i. e., “showing ill will and malevolence, or a desire to thwart and injure” (Webster); but unless such ill will becomes manifest by the tribe, as such, by engaging in acts of hostility, the relation of amity will continue.
In other words, the acts of the Indians and not their feeling and purpose must determine whether or not they were engaged in actual hostilities.
Tested by this rule the Mimbres band was not in amity with the United States at the time of the depredation, as it began actual hostilities in 1861 and continued therein until after 1867.
Therefore, as to the sum of $3,150 included in the judgment allowed by the Secretary of the Interior for this depredation, the judgment is erroneous, and unless this sum be remitted the motion for a new trial will have to be sustained.
As to the depredations committed by the Arivaipa band of Apache Indians within a radius of 40 miles of Tucson, Ariz., in 1868,1869, and 1870, we have been unable to find any evidence in the published reports for any of the years named identifying this band of Indians with the numerous robberies therein reported or connecting them with any conflict with the military authorities.
These Indians made their home in Arizona, on the Arivaipa Creek, near the Gila Eiver, about 50 miles from Tucson, and were being rationed and fed at Camp Goodwin by the United States.
The Secretary of the Interior, in his report for 1868, page 463, in speaking of the Apache Indians generally, says:
“ Hostilities to some extent yet exist on the part of the wild, warlike Apaches of New Mexico and Arizona Territories, and an unsatisfactory condition of things will continue with these tribes until something is done in the way of establishing them upon reservations or restricting them to particular districts of country with such aid as policy may require to bring about and maintain a friendly disposition on their part toward citizens and neighboring tribes.”
*13 For tbe year 1869 tbe Commissioner of Indian Affairs, in bis report as to Arizona, says :
“A large, wild, and apparently untamable body of Indians are embraced in this snperintendency. Murders and outrages by them upon citizens are of frequent occurrence, and will occur as long as they are allowed to roam at will and are certain of safety from pursuit in their mountainous places of retreat. Being under tbe surveillance and jurisdiction of tbe military, this department has but little intercourse with them. It is known, however, that during the past year many of the citizens have been killed, others wounded, and a large quantity of property stolen by the warlike and vicious Apaches, and it is only by the presence and power of the military that they are prevented from depopulating the Territory of its miners and settlers.” (Messages and Documents, 1869-70, Interior Department, 2d sess. 41st Cong., pp. 460, 461.)
General Ord, in his report for September, 1869 (Messages and Documents War Department, 1,1869 and 1870, p. 121), in substance says that on taking command of the department he became satisfied that the few settlers and scattered miners of Arizona were the sheep upon which these wolves habitually preyed, and that a temporizing policy would not answer, and so he “ encouraged the troops to capture and root out the Apaches by every means and to hunt them as they would wild animals.” u This,” he says, “ they have done with unrelenting vigor, and as a result ” he says, “ since my last report over 200 have been killed, generally by parties who have trailed them for days and weeks into the mountain recesses, over snows, among gorges and precipices, lying in wait for them by day and following them by night.”
In the table appended to this report, pages 127-129, it appears that 66 parties were sent out in search of Indians, traveling over 11,000 miles, and that as a result of these expeditions 207 Indians were killed, 75 wounded, and 65 men, women, and children taken prisoners, while 1 enlisted man was killed or captured and 3 wounded.
For the year 1870 the superintendent of Indian affairs for Arizona says:
“As is well known, the most enterprising and troublesome Indians are the various bands of Apaches; and should the time ever arrive when they are subdued and brought under control one of the greatest impediments to the advancement of the Territory will have been removed. To state accurately *14 the number of lives and the amount of property destroyed by these Indians during- the past year would, I presume, be found impossible; but the following- summary of the outrages enacted in Pima County alone during the year ending with July last will carry an adequate idea of what the frontiersman has to contend with in this section: 4Forty-seven men have been murdered, 6 wounded, and 1 carried into captivity; more than 500 head- of cattle have been killed and captured, and property, exclusive of live stock, to the value of more than $10,000 has been destroyed and carried off.’ ” (Messages and Documents, 1870-71, Interior Department, pt. 1, pp. 578, 579.)
The governor of Arizona, under date of August 5, 1870, says:
* * * “The Apache Indians have kept up such constant war against us ever since the acquisition of Arizona from Mexico, their promises have been so often violated, their movements so secret, their ambushes so skillfully laid, their raids so widespread, rapid, and destructive of human life, that the general impression has obtained that they desire no peace and were incapable of observing any obligation.” (Ibid., p. 600.)
On the other hand the Commissioner of Indian Affairs, in his report of October 31,1870, says:
“Since the date of the last annual report of this office our relations with the various Indian tribes have been as favorable as could be expected. No serious outbreaks or demonstrations of hostility threatening to involve any tribe in war with the Government have occurred, and it may be truly asserted that quiet has generally prevailed among them. The exceptions, I am pleased to observe, are very'few, and with these the prospect is that by judicious management a more hopeful and promising condition of affairs will exist in the future. Those with whom we had, perhaps, the greatest trouble are the Piegan Indians, a band of the Blackfeet nation, who range in Montana and across into the British Possessions. * * * We have reports from the military in Arizona, and from Hon. A. P. EL. Safford, governor thereof, that the Coyoteros, or White Mountain Apaches, 1,400 or 1,500 in number, have expressed their desire to be at peace and placed upon a reservation under the protection of the Government; and the opinion is entertained that if the Indian Bureau would take charge of them by a competent agent and furnish them with seeds and agricultural implements their civilization would be ultimately secured.” Ibid., pp. 467, 472.)
From the numerous reports cited by counsel on both sides, portions of which we have set out above, as well as from the *15 other evidence in the case, we reach the conclusion that during the period covered by these depredations the Apache Indians generally were “ about the most troublesome Indians to be found anywhere,” committing many murders and frequent depredations, and this agrees with the testimony of the claimant in this case, who says that six men were hilled during these depredations and several more wounded, besides considerable property destroyed.
As before stated, however, we have been unable to find any evidence, documentary or otherwise, connecting or identifying the Arivaipa band with any of the murders and outrages thus reported, except in a general way, as applicable to the Apaches generally in Arizona, of which there were many besides the Arivaipa band, as shown by the reports set out.
True, some of the claimant’s employees were killed at the time of the several depredations by Indians belonging to this band, but from these acts alone the court can not conclude that the band, as such, was at the time engaged in actual hostilities against the United States, even though their acts in this respect tend to support the theory that it was so engaged.
Failure therefore to identify this particular band with the numerous murders and outrages reported for the years named, or in any way connecting them as a band resisting the military authorities, we must conclude that the band was at the time of the several depredations, to wit, July 22,1868, May 11,1869, and December 18,1870, in amity with the United States.
It follows that the judgment as to the amount of $12,065, being for the three allowances by the Secretary of the Interior for the depredations for the years named, was correct, and if the claimant shall remit the sum of $3,150, as hereinbefore stated, the judgment will be allowed to stand as to the residue, and the court will then file an additional finding of fact, setting forth that the depredations in the years 1868,1869, and 1870 were committed by the Arivaipa band of Apache Indians, otherwise the motion for a new trial will be sustained.
Further proceedings herein are suspended to await the action -of the claimant, in accordance with this opinion.