Peelle, J.,
delivered the opinion of the court:
The questions submitted for our determination arise on the defendants’ motion for a new trial, filed November 26, 1894, under Revised Statutes, section 1088.
It is averred in the petition, among other things, in substance, that on February 4, 1865, at Julesburg, in Colorado, the defendant Indians destroyed or carried away property belonging to the claimant, consisting of wagons, provisions, stock, etc., amounting to the sum of $9,513.70.
And further, that on October 23,1865, at Alkali Station, in Nebraska, the defendant Indians shot or drove off 46 head of oxen belonging to the claimant, of the value of $5,152, and all of the value of $14,665.70.
It is further averred that a claim for the property so taken or destroyed was filed in the Department of the Interior June 22, 1882, which was examined by the Secretary of the Interior, and on February 16, 1891, that officer allowed the sum of $10,190.
On February 13, 1893, judgment was rendered in this court on stipulation of the parties for $10,190, under the provision of section 4 of the act March 3,1891. (26 Stat. L., 851)'
The defendants’ motion for a new trial as aforesaid, filed within two years from the date of the rendition of the judgment, assigned as specific grounds for a new trial, among other things, that “the defendant Indians at the date of the alleged depredations were not in amity with the United States.”
And further that the claimant was not at said date “the sole owner of the property alleged to have been taken.”
The stipulation filed and upon which agreement judgment was rendered refers only to the depredation of February 4, 1865, though the allowance by the Secretary of the Interior covered the property taken or destroyed at both depredations, and the omission to include the property taken or destroyed October 23,1865, was doubtless a clerical error, especially as the property alleged to have been taken or destroyed February 4,1865, was valued by the claimant, as alleged in his petition, at less than $10,000.
This action, as indicated by the above title, is against the Sioux and Cheyenne Indians, though the allowance made by *587 tbe Secretary of the Interior was against the Sioux, Cheyenne, and Arapahoe Indians, and the evidence of sundry witnesses before the court satisfactorily shows that the depredation of February 4,1865, was committed by the Sioux,' Cheyenne, and Arapahoe Indians, while the one of October 23, 1865, was committed by the Sioux and Cheyenne Indians.
Both parties have briefed and argued the case on the theory that the three tribes are defendants, and we will so consider the case, at least on the question of amity.
The material facts and circumstances bearing on the question of the amity of the defendant Indians at the time of the depredations are, in brief, these:
At the time of the depredations stated the claimant was a freighter between the Missouri River and Denver.
Prior to February 4,1865, the claimant, with a train of 25 ox wagons, had transported to Julesburg, in the northeast corner of Colorado, a large amount of grain, flour, groceries, and other merchandise, which had been unloaded and placed in a warehouse at that place for safety; and on that day a body of Sioux, Cheyenne, and Arapahoe Indians, numbering' from 1,000 to 2,000 and acting in concert, attacked the station, destroyed the building, and burned or otherwise destroyed or carried away the merchandise, burned some of the wagons, drove away his cattle, and killed all of his herders but one, scalping four.
At the time of this attack the troops of the United States, with the aid of many of the citizens, endeavored to check the Indians in their wantoii destruction of life and property, and succeeded in saving some of the wagons, but with the loss of 22 soldiers and citizens killed.
The depredation of October 23, 1865, was at Alkali Station, in northwestern Nebraska, some 60 miles east of Julesburg, by a large body of Sioux and Cheyenne Indians, whereby they took and drove away or shot 46 work oxen belonging to the claimant, but his wagons and other property were protected by the herders and others repelling any further attack.
The reports for 1864, both civil and military, indicate quite clearly that early in the spring of that year, if not before, a combination was anticipated by the officials between the Kiowa,.Comanche, and Apache Indians of the south with the Sioux, Cheyenne, and Arapahoes of the north for the purpose of hostilities on the white settlers; and it appears from the *588 same reports that engagements were had in April and May between the troops of tlie United States and some of the Indians named, but it does not appear that the defendant Indians were connected therewith, nor does it appear that the Indians generally were so engaged.
It does appear from the reports for that year, however, that the defendant Indians engaged in serious and extensive depredations about that time, robbing settlers, stealing their stock, and to protect their stolen property occasionally killed some of the citizens; but their purpose at this time appears to have been plunder and pillage and not war.
Late in June the governor of Colorado issued his proclamation calling upon agents, interpreters, and traders “ to inform the friendly Indians of the plains that some members of their tribes have-gone to war with the white people.”
In response to that proclamation two bands of Arapahoe Indians, known as “Fridays” and “Left bands,” came in, the former at Camp Collins, where it remained, and the latter at Fort Lyon, where it remained only for a short time and then joined the hostiles, who up to this time were principally the Indians from the south.
July 14, 1864, Indian Agent Whitely, writing from Denver in reference to the Arapahoe and Sioux Indians on the Upper Platte in the vicinity of Cache La Poudre, says:
“In all my talks with them they appear to evince a disposition to keep the peace with the whites, and many of them express a great deal of auxiety for the coming in of Eoman Nose and the medicine man with their respective bands, that a treaty may be effected and they may begin to reap the advantages of a permanent settlement. I am the more convinced of their sincerity in these expressions from the fact that several of the settlers on the Cache La Poudre assure me that they have so declared themselves in their hearing.” (Keport Sec. Int. 1864, p. 379.)
So that at this time the Indians in the vicinity named appear to have been well disposed.
July 26, 1864, Indian Agent Colley, writing to Governor Evans from Fort Lyon, southern Colorado, states that when he last wrote him he “was in hopes that our Indian troubles were at an end,” but says affairs from Larned (southern Kansas) are bad; that they had “ killed some ten men from a train and run off all the stock from the post,” and that his informa- *589 tiou was that “ all the tribes were engaged in it.” (Eeport Secretary of the Interior, 1864, p. 374.)
It is evident that the tribes referred to were the Kiowa and Comanche, and perhaps some Cheyennes and Arapahoes from the south, as at that time they were within the agency of Col-ley, while the great body of the Sioux were far to the north.
There may have been a few bad men from the Sioux and other northern tribes associated with the Kiowa, Comanche, and other Indians from the south in their hostile acts, but there is nothing in the reports to justify us in holding that the defendant Indians, as tribes or bands, were so engaged.
The official reports do not indicate clearly the distinction between the southern and northern tribes, but as the southern tribes were in and about Fort Lyon and Fort Larned, in the southern part of Colorado and Kansas, where most of the hostile acts were committed up to this time, we are of the opinion that the Cheyenne and Arapahoe Indians referred to as being allied with the Kiowa and Comanche were those from the south and not the defendant Indians.
Although frequent reference is made in the official reports for 1864 about a combination between the southern and northern tribes, we have been unable to find any report showing that such combination was up to this time an accomplished fact.
The reports show that the military were actively engaged during the year 1864 in suppressing depredations and outrages committed by the Indians from the south, and there are also references to the hostility of the northern tribes, but few acts other than depredations are shown to have been committed by them as tribes or bands until after July 28, when General Sully, with a force of some 2,000 soldiers, encountered on Knife Liver from 5,000 to 6,000 warriors, composed of the Uncpapas, Sans Arcs, Blackfeet, Minneconjous, Yanktonais, and Santee Sioux, and had an engagement with them, in which 100 to 150 Indians were killed. (Rebellion Records, series 1, part 1, vol. 41, p. 142.)
For further and continued conflicts and skirmishes with the same Indians, see General Sully’s reports, ibid., page 144 et seq.
Frequent depredations occurred, and in furtherance of their purpose the Indians, acting in concert, on August 8, 1864, *590 made an “ almost simultaneous attack upon tbe stations of the overland stage line, trains on the road, and settlements for a distance of over 200 miles, accompanied by the most horrible murders and wanton destruction of property.” (Eeport Secretary of the Interior, 1864, p. 363.)
August 13, 1864, George K. Otis, general superintendent of the Overland Mail Line, writing from Washington, D. 0., to the Commissioner of Indian Affairs, states that “ on the 10th of this month simultaneous attacks were made upon the stations of the mail line above mentioned between Little Blue Eiver and Junction Station, 80 miles east of Denver, by bands of Cheyennes, Sioux, Kiowas, and Arapahoes. The first assault was made at Ewbauk Station, 100 miles east of Fort Kearney. A family, ten in number, living at this station was massacred and scalped.” (Eeport Sec. Int., 1864, p. 398.) These were doubtless the Northern Cheyenne and Arapahoes and the Oga-lalla, Brule, and perhaps other Sioux Indians. These acts Avere about the same time as the engagement between the troops under General Sully and the Indians farther north.
In the same communication anumber of murders are detailed along the mail route, and he further states that the Indians “have stolen upward of 3,000 head of cattle and horses and destroyed property to the value of $1,000,000; they have also burned all of the stations except one upon the Overland Mail mute, on that portion of the line from Thirty-two Mile Creek to the Big Sandy Eiver, a distance of 120 miles.”
Further along in this same communication it is stated in substance that in consequence of the devastation the mail company was compelled to abandon their stations for a distance of 400 miles.
Furthermore, the old Indian traders, it is stated, “who are familiar with the nature and habits of the Indians” abandoned their habitations from Julesburg to Big Sandy, a distance of 370 miles, leaving their property to the Indians. (Ibid.)
October 1, 1864, the agent for the Upper Missouri Sioux wrote that his agency included seven tribes of the Sioux, numbering about 13,000, and that of that number 10,000 were hostile and at war with the United States, and further that “someof this number are engaged in committing depredations on the overland commerce and mails for the last three months *591 by way of the Platte River route,” which doubtless means the attacks referred to by Mr. Otis (supra). (Report Secretary of the Interior, 1864, p. 417.)
The Indians of the Upper Platte Agency, consisting of some 10,000 comprising the Brule and Ogalalla Sioux and the Cheyenne and Arapahoes, were also hostile at this time, as will appear from the reports of the Secretary of War and the Secretary of the Interior for 1864.
Soon after the engagement with General Sully, July 28, on Knife River, the authorities of the Territory of Nebraska called and mustered into active service troops for the suppression of Indian hostilities. Some of the men thus called were mustered into the service, as shown by communication transmitted to the court from the Treasury Department and from the adjutant-general of Nebraska, as early as August 12,1864, some two weeks after the engagement with General Sully, and consisted of five companies, numbering some 220 men.
For the expenses so incurred the Congress, by the Act July 27, 1866 (14 Stat. L., 307), provided for the reimbursement of the Territory.
The defendant Indians, with the exceptions hereinbefore stated, continued their hostile acts, burning wagon trains and ranches, killing men, women, and children, burning stage stations and telegraph offices and private dwellings, and generally laying waste the lines of. travel between the Missouri River and the States and Territories on the Pacific Coast.
These wanton destructions of life and property led up to and were followed by the massacre of the friendly Cheyenne Indians under Black Kettle at Sand Creek, November 29,1864.
“Exasperated and maddened by this cold-blooded butchery of their women and children, disarmed warriors, and old men,, the remnant of these Indians sought the aid and protection of the Comanches and Kiowas, and obtained both. The combination which followed embraced all the tribes of the plains from the Red River of the South to the Red River of the North, and resulted in the general Indian war of 1865, which cost our people many valuable lives and $40,000,000 in money.” (Report Committee on Indian Affairs, Senate Ex. Doc. 13, 40 Cong., 1st sess., p. 2.)
The combination, which before was in embryo', now became an accomplished fact, and the result was an Indian war in which the defendant Indians participated.
*592 In that same report it is stated that “peace was concluded witli the Southern tribes in October, 1865. Peace was likewise made with the Missouri River Indians late in the same autumn, and the Indians engaged in the recent hostilities (Sioux) gave notice that they also were willing to bury the tomahawk.” Treaties were accordingly made with them October 28, 1865. (14 Stat. L., 695 to 747.)
The defendants, however, contend that the treaties so made were only with a minority of the tribes, and for that reason should not be accepted by the court as establishing prima facie amity; but the validity of the treaty with the Sioux was considered in the Leighton Case (29 C. Cls. R., 288) and in the Coe & Carter Case (31 C. Cls. R., 441), following the case of Fellows v. Blacksmith (19 How., 360, 372), and authorities there cited, and need not be further considered here.
The treaty made with the Cheyennes and Arapahoes appears to have been made with representatives of those tribes from the South, but it was claimed by the commission that negotiated the same that it represented the views and wishes of their brethren in the North. ■ (Report Secretary of the Interior, 1865, p. 721.)
The treaty thus negotiated was subsequently ratified by the Senate, and on March 17,1866, was proclaimed by the President.
Aside, however, from the treaties referred to, the defendant Indians thereafter became peaceable in fact, and so remained until late in the summer of 1866.
In referring to these same Indians the Secretary of the Interior, in his report for 1866-67, page 2, says:
“The winter of 1865 proved to be one of universal severity, however, in the region which they inhabit, and the long-continued cold weather (with snows of almost unprecedented depth) accomplished, in the interest of peace, what war, waged at great expense, had failed to achieve.”
Then follows the statement that in February, 1866, a deputation of Indians representing the Sioux, by far the most numerous and powerful of these tribes, reached Fort Laramie, and, through an interpreter, represented to the commanding officer “that their tribes were in a condition of utter destitution, without. food and scantily supplied with clothing; that their blankets were worn ont, their horses and ponies nearly all dead, and that their young men were tired of war, and *593 desired the reestablishment of peace.” This was followed by a cessation of hostilities until the time fixed for the meeting of the peace commission at Fort Laramie, in June following'. (Ibid.)
In the Carter Case (31 C. Cls. R., 441, 448) we held that the Ogalalla band of Sioux Indians were not in amity with the United States on July 17,1866, and this holding, we think, applies to the defendant Indians herein.
The evidence does not satisfy the court as to what particular band committed the depredations, so we have considered the political entities under the general name of Sioux, Cheyenne, and Arapahoe: but if it be contended that thg Ogalalla or Brule Sioux were the only Sioux Indians who committed the depredations in connection with the other Indians named, which is probable, they were unquestionably hostile during the period stated below.
From our examination, therefore, of the official reports we reach the conclusion that the defendant Indians were in amity with the United States from January 1, 1864, to July 28,1864, and that from the latter date to October 28,1865, they were engaged in actual hostilities, after which they were in amity until July 17, 1866.
It follows that at the time of the depredations, to wit, February 4 and October 23, 1865, herein mentioned, the defendant Indians were not in amity with the United States, and the defendants’ motion for a new trial is therefore sustained and a new trial granted.
Having reached this conclusion, we need not consider the other question, as to the ownership of the property.
Howby, J., was not present when this case was tried and took no part in the decision.