Peelle, J.,
delivered the opinion of the court:
The claimant, as surviving partner of the late firm of E. Montoya & Sons, seeks to recover under the Act March 3,1891 (26 Stat. L., 851), for the loss of horses, mules, and other live stock taken from them without just cause or provocation, on the 12th of March, 1880, in Socorro County, N. Mex., by Mesealero Apache Indians, then and for a long time prior thereto allied with Victoria, a Chiricahua Apache, and his followers, under the name of Victoria’s band, as set forth in the findings,
*354 Two questions are presented for our consideration: (1) Wbat was the status of Victoria’s band of Indians, i. e., was it at the time of the depredation herein a band — a responsible entity— within the meaning of the act cited i And (2) if so, was it in amity with the United States %
In 1876 an effort was made to remove the Chiricah.ua band of Apache Indians from their homes in southeastern Arizona to the San Carlos Reservation, but they resisted and a minority of them, including Victoria, became hostile and so continued until December, 1878.
In February following, Victoria, with 22 followers, came near the military post of Ojo Caliente and agreed to surrender conditionally, but in April following he, with his followers, escaped and went to the San Hateo Mountains. He was pursued by the military forces, but escaped into Mexico.
In June following, Victoria, with 13 men, reported at the Mescalero Reservation, near Fort Stanton, N. Nex., but, being under indictment for murder and horse stealing, Victoria became fearful of arrest and conviction and suddenly left the reservation, taking with him those he had brought and also all the Southern Apaches on that reservation.
They went west and began marauding, destroying property, and killing citizens, and so continued until the spring of 1880, Victoria in the meantime using his influence to induce the Mescaleros to join his forces; and by April, 1880, some 200 to 250, of whom 50 or 60 were men, left their reservation and joined him.
They continued their acts of hostility and warfare, engaging the United States troops in battle and in skirmishes from that time until finally driven into Mexico, where Victoria and nearly all his followers were killed.
Victoria’s band was composed of a minority of the Indians from the Chiricahua, Mescalero, and other tribes of Apache Indians, and of some unknown Indians from Mexico, numbering in all, at the time of the depredation herein found, about 200 Indians composing the band, all of whom were allied together for the purpose of resisting the military authorities in placing the Ghiricahuas on the San Garlos Reservation, and for the purpose of aiding Victoria in his hostile and warlike acts against the citizens and the military authorities of the United States.
*355 The claimant’s contention is that the band, as thus constituted, was an unlawful mob of renegades, amenable to the civil law as murderers and robbers, and not therefore a. band— a responsible entity — entitled to belligerent rights within the meaning of the act of 1891 (supra).
Prior to the passage of tjie act of 1891, the Government had entered into treaty relations with nearly all the tribes and nations of Indians in the United States and also with many of the bands composing the tribes and nations.
By such treaties the tribal relations of such Indians were thereby recognized by the political departments of the Government, but where such relations did not exist, in respect to Indians charged with committing depredations, the court will look elsewhere to ascertain their status, as the liability of the United States is limited to depredations committed by “ Indians belonging to any band, tribe, or nation in amity with theUnited States,” and are “in fact, if not in form, the primary and solvent judgment debtor. The recourse provided over against the Indian tribe, while it may be certain as to amount, is uncertain as to collection, and, before any judgment should be rendered binding the United States, it is familiar and settled law that the statute claimed to justify such judgment should be clear and not open to debate.” (Leighton v. United States, 161 U. S., 291, 297.)
In the Tully Case (ante, p. 1) we had occasion to consider somewhat the status of the Apache Indians in respect to their relation to the United States; and, as there stated, a treaty was negotiated with them as a nation July 1, 1852 (10 Stat. L., 979).
Later (1853) a portion of them,not including the Chiricahuas, were confederated with the Kiowa and Comanche Indians by treaty (10 Stat. L., 1013), but in I860 they were transferred to the Cheyennes and Arapahoes (14 Stat. L., 713).
In 1867 they were again confederated with the Kiowas and Comanches (15 Stat. L., 589).
But the Apaches thus confederated lived remote from the Apaches of New Mexico and Arizona and had no connection therewith at the time of the hostile acts by Victoria and his followers. So that the only treaty relation Victoria and his followers sustained to the United States was by the treaty of July 1, 1852 (supra), as a part of the Apache Nation.
*356 The court will therefore have to look elsewhere to ascertain the relation of Victoria’s band to the United States, and in this connection the court in the Tully Case (supra) said:
“ The policy of the United States in dealing- with the Indians . has been, as we understand, to accept the subdivisions of the Indians into such tribes or bands as the Indians themselves adopted and to treat with them accordingly.
“So that if such subdivisions, whether into tribes or bands, have not been recognized by treaty, but have been by the officers of the Government whose duty it was to report in respect thereto, then the court will accept that as sufficient recognition of the tribe or band upon which to predicate a judgment.
“ Or if there be no such recognition by the Government, then the court will accept the subdivisions into such tribes or bands as made by the Indians themselves, whether such tribes and bands be named by reason of their geographical location or otherwise.”
The confederation of Indians from the various tribes or bands under the leadership of Victoria, as set forth in the findings, was not for the purpose of robbery and theft, but was for the purpose of aiding Victoria and his Chiricahua followers in resisting the military authorities in removing them to the San Carlos Reservation; and to effectuate their purpose they unitedly committed acts of hostility and war against the United States — not a single act, but continuous acts of hostility, i. e., battles and skirmishes with the troops of the United States covering a period of more than two years and until their numbers were depleted in battle and the few remaining were finally driven into Mexico, where Victoria and nearly all of his followers were killed.
During these acts of hostility as aforesaid, Victoria and his followers were frequently recognized or referred to in the reports of the officers of the United States, both civil and military, as “Victoria’s band” of Apache Indians as set forth in the findings; and as such band was operated against by the troops of the United States from “numerous camps in Mexico,” as reported by Lieutenant-General Sheridan, October 22, 1880. (Report Secretary of War 1880, p. 52.)
Was the alliance of Indians thus constituted, coupled with their continuous hostile acts as aforesaid, sufficient to constitute them a band within the meaning of the act of 1891 (supra) ?
By the first section of the act the court is given “jurisdiction and authority to inquire into and finally adjudicate” *357 * * * “all claims for property of citizens of the.United States taken or destroyed by Indians belonging to any band, tribe, or nation in amity with, the United States, without just cause or provocation on the part of tlie owner or agent in charge and not returned or paid for.”
The political status of the Indians in the United States was first considered by the court in the well-known case of Cherokee Nation v. Georgia (5 Pet., 1), where the court, in considering the question as to whether an injunction would lie to restrain the State of Georgia from the execution of certain laws of that State, which it was alleged, among other things, would “ go directly to annihilate the Oherokees as a political society and to seize, for the use of Georgia, the lands of the nation,” denominated the Indian nations as “ domestic dependent nations,” resembling, in their relations to the United States, “a ward to his guardian,” and not being a foreign nation within the meaning of section 2, Article III, of the Constitution, could not maintain a suit in the courts of the United States.”
In the case of Worcester v. The State of Georgia (6 Pet., 515, 548) the court, in reviewing the policy of Great Britain in her relation to the Indians inhabiting this country, said: “ She considered them as nations capable of maintaining the relations of peace and war; of governing themselves, under her protection; and she made treaties with them, the obligation of which she acknowledged.” This, the court says, “ was the settled state of things when the war of our Revolution commenced.”
The first treaty, which the court says was made with the Delawares in September, 1778 (7 Stat. L., 13), was “in its language and in its provisions” formed “on the model of treaties between the crowned heads of Europe.”
The court further says (p. 559):
“The Indian nations had always been considered as distinct, independent political communities, retaining their original natural rights as the undisputed possessors of the soil from time immemorial, with the single exception of that imposed by irresistible power, which excluded them from intercourse with any other European potentate than the first discoverer of the coast of the particular region claimed, and this was a restriction which those European potentates imposed on themselves as well as on the Indians. The very term ‘nation,’ so generally applied to them, means A people distinct from others.’ The *358 Constitution, by declaring treaties already made, as well as those to be made, to be the supreme law of the land, has adopted and sanctioned the previous treaties with the Indian nations, and consequently admits tbeir rank among those powers who are capable of making treaties. The words ‘ treaty7 and ‘nation7 are words of our own language, selected in our diplomatic and legislative proceedings by ourselves, having each a definite and well-understood meaning. We have applied them to Indians as we have applied them to the other nations of the earth. They are applied to all in the same sense.77
Later, in the case of Holden v. Joy (17 Wall., 211, 242), the court said:
“ Indian tribes are States in a certain sense, though not foreign States, or States of the United States, within the- meaning of the second section of the third article of the Constitution which extends the judicial power to controversies between two or more States, between a State and citizens of another State, between citizens of different States, and between a State or the citizens thereof and foreign States, citizens, or subjects. They are not States within the meaning of any one of those clauses of the Constitution, and yet, in a certain domestic sense, and for certain municipal purposes, they are States, and have been uniformly so treated since the settlement of our country and throughout its history, and numerous treaties made with them recognize them as a people capable of maintaining the relations of peace and war, of being responsible in their political character for any violation of their engagements, or for any aggression committed on the citizens of the United States by any individual of their community. Laws have been enacted by Congress in the spirit of those treaties, and the acts of our Government, both in the executive and legislative departments, plainly recognize such tribes or nations as States, and the courts of the United States are bound by those acts.”
The theory of those decisions was that, as the policy of Great Britain in recognizing the Indians as “ nations capable of maintaining the relation of peace and war” had been recognized by the United States in their treaties with the Indians and sanctioned by the Constitution, by declaring “all treaties made or which shall be made, under the authority of the United States,77 as “the supreme law of the land,” the status of the Indians “as distinct, independent political communities” was to continue.
It was because of those decisions that the court in the Leigh-ton Case (29 C. Cls. R., 288) considered the Indian tribes as “independent political communities,” entitled, in the contest *359 of arms, to belligerent rights; and such was the holding of the court in the Love Case (29 C. Cls. R., 332).
From an examination of the treaties found in 7 Stat. L., 13 et seq., it will be seen that the first treaties made by the United States with the various Indians, beginning in 1778, were with them in their character as nations, as with the Delaware Nation, Six Nations, Ghoetcm Nation, OreeJc Nation, Sioux Nation, Apache Nation, etc.
Subsequently other like treaties were made with the same and other Indians, recognizing them in their character as nations, while many of the nations were united or confederated together and treaties made with them accordingly.
Later treaties were made with some of these same nations as tribes, followed by many treaties with the bands composing the nation or tribe, as with the various bands composing the Sioux Nation, and the bands of the Chippewas, Yakamas, Senecas, Shoshones, etc. (7 Stat. L., 257 et seq., and Bevision of Indian Treaties, p. 227 et seq.), thus showing that the United States recognized the Indians for the purpose of a treaty in whatever character they chose, whether as nations, tribes, or bands.
The main purpose in treating with the Indians was to secure and maintain peace with them, and thereby open up the country to advancing civilization, and whenever that could be attained treaties appear to have been made with them without reference to their particular form of government or tribal organization.
The chief executive or responsible head of the organization, whatever its character, was the one whose signature was sought in making treaties.
This may furnish the reason why the Congress in the act of 1891 make no distinction between tribes, bands, and nations in respect to the amity of the political entity essential to give the court jurisdiction.
A tribe, says Webster’s Dictionary, is—
“A family, race, or series of generations, descending from the same progenitor, and kept distinct. * * *
“A nation of savages or uncivilized people; a body of rude people united under one leader or government; as, the tribes of the Six Nations; the Seneca tribe of America.
*360 “A division, class, or distinct portion of people or persons, from whatever cause that distinction may have originated; as, the city of Athens was divided into ten tribes.”
The Century Dictionary says tribe means—
“ Specifically, a division of a barbarous race of people, usually distinguished in some way from their congeners, united into a community under a recognized head or chief, ruling either independently or subordinately. In general the tribe, as it still exists among the American Indians and many African and Asiatic races, is the earliest form of political organizations, nations being ultimately constituted by their gradual amalgamation and loss-of identity in the progress of civilization.”
A band, as defined by Webster’s Dictionary, is—
“A company of persons united in any common design, especially a body of armed men.
“To unite in a troop, company, or confederacy.
“To confederate for some common purpose; to unite; to conspire together.”
The Century Dictionary gives the same, or substantially the same, meaning. A band, therefore, may be composed of members from different tribes or families, although ordinarily a separate -organization or entity within the tribe.
In speaking of the characteristics and customs of the Indians at the time the English took possession of the country, Bancroft, in his History of the United States (vol. 1, p. 80), says: “But the great peculiarity of the Indians consisted in the want of political connection. A single town often constituted a government; a collection of ten or twenty wigwams might be an independent state. The greatest chief in the country could not muster more than seven or eight hundred fighting men. The dialect of each government seemed a language by itself.”
“Their government,” he further says (vol. 2, p.425), “rested on opinion and usage, and the motives to the usage were never embodied in language; they gained utterance only in the fact and power only from opinion. No ancient legislator believed that human society could be maintained with so little artifice. Unconscious of political principles, they remained under the influence of instincts. Their forms of government grew out of their passions and their wants, and were therefore everywhere nearly the same. Without a code of laws, without a distinct recognition of succession in the magistracy by inheritance or election, government was conducted harmoniously by *361 tbe influence of native genius, virtue, and experience. * * * Tbe Indian chief bas no crown or scepter or guards; no outward symbols of supremacy or means of giving validity to bis decrees. Tbe bounds of bis authority float with the current of opinion in tbe tribe; be is not so much obeyed as followed with tbe alacrity of free volition, and therefore tbe extent of his power depends on bis personal character. There have been chiefs whose commanding genius could so overawe and sway tbe common mind as to gain, for a season, an almost absolute rule, while others had little authority, and, if they used menaces, were abandoned.”
In the light of what has been said, was not Victoria entitled to rank as the chief or head of an organization known as a band?
It was not an assembly or organization of people having in view plunder and pillage for a day or a week and then of separating and returning to their several homes, in which case their respective tribes, if in amity with the United States, would be liable; but it was a band separate and distinct in its organization, and in its action independent of the several tribes or bands to which its members theretofore belonged, and having confederated themselves together under the leadership of Victoria as a band for the common purpose of hostilities and war, without the consent of their respective tribes, and so’ continued their hostile acts for more than two years, they thereby transferred their allegiance to the band and recognized Victoria as the executive head. This constituted the organization a band — a separate and distinct entity — within the meaning of the act of 1891, and as such was recognized by the officers of the United States and operated against by the military authorities in the usual mode of warfare against the Indians.
That the band as thus constituted was actually hostile to the United States from its inception until its destruction there can be no doubt; hence the band as a band was not in amity with the United States at the time of the depredation, March 12, 1880, and was not for a long time prior or subsequent thereto.
This being true, it matters not that the Mescalero tribe, to which the depredating Indians formerly belonged, was at the time in amity with the United States, as by thus allying themselves with the band under the leadership of Victoria for the *362 purpose of war without the consent of their tribe — then at peace — they thereby transferred their allegiance to the newly organized band; and their hostile acts, therefore, are to be determined by the status of the band with which they were thus allied.
This would unquestionably be the rule if Victoria had been the chief or headman of a majority of the Chiricahuas, of which he was a member.
Where a few individual members of a tribe, at peace, without its consent confederate with a tribe at war and engage with it in acts of hostility against the United States, and while so engaged take or destroy the property of a citizen, such individuals will, for the purpose of determining the character of such act, be considered as members of the hostile tribe.
For the reasons stated the court is without jurisdiction, and the petition is dismissed.