Peelle, J.,
delivered the opinion of the court:
The question presented arises on the defendants’ motion'for a new trial under Revised Statutes, section 1088.
*100 The case is prosecuted under the Indian depredation act, March 3,1891 (26 Stat. L., 851).
The facts disclosed by the averments in the petition are briefly these:
October 25,1860, the claimant, a citizen of the United States, residing in Palo Pinto County, Tex., was the owner of a large herd of horses and colts, and on said date, early in the morning, Comanche Indians took and drove away, without the claimant’s consent, 141 head of said stock, valued at $14,200, and never returned or paid for the same or any part thereof.
A claim for said loss was presented to the Commissioner of Indian Affairs, and, after an investigation as to the merits ■ of the same, the Secretary of the Interior allowed $9,960, pursuant to the act of March 3,1885 (23 Stat. L., 376).
Being an allowed claim under the .act, and neither party electing to reopen the same, judgment was rendered on stipulation of the parties therefor, January 11,1893, pursuant to' the last paragraph of section 4, act 1891 (supra), which reads:
“Provided, That all unpaid claims which have heretofore been examined, approved, and allowed by the Secretary of the Interior, or under his direction, in pursuance of the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes, for the year ending June thirtieth, eighteen hundred and eighty-six, and for other purposes, approved March third, eighteen hundred and eighty-five, and subsequent Indian appropriation acts, shall have priority of consideration by such court, and judgments for the amounts therein found due shall be rendered, unless either the claimant or the United States shall elect to reopen the case and try the same before the court, in which event the testimony in the case given by the witnesses and the documentary evidence, including reports of Department agents therein, may be read as depositions and proofs: Provided, That the party electing to reopen the case shall assume the burden of proof.”
The motion for a new trial was filed December 15,1894, in these words:
“In this cause, wherein judgment was rendered on February 13, 1893, for the sum of $9,960, comes the Assistant Attorney-General for and on behalf of the defendants, and moves the court for a new trial thereof, in accordance with the provisions of section 1088 of the Revised Statutes of the United States, for the reason that in the award of said judgment wrong and injustice were done the United States, in this, that—
“(1) The defendant Indians were not at the time of the alleged depredation in amity with the United States.
*101 “(2) Tbe Secretary of tbe Interior was without authority to allow said claim.
“(3) Tbe stipulation for judgment was without authority of law.
“ (4) In entering the j udgment pro forma the court was without jurisdiction, and said judgment operates as a wrong and injustice to the Dnited States and the other defendants.
‘‘Wherefore the said judgment should be set aside and vacatéd and a new hearing ordered by tlie court.”
The first reason assigned goes to the jurisdiction of the court, and if well taken the motion will of course have to be sustained; otherwise, there being' no controversy as to the commission of the depredation and the amount of the judgment, the court will consider the same as rightly entered if the right parties are defendants.
The depredation alleged in the petition, and on account of which judgment was -rendered, was committed in Palo Pinto County, in the State of Texas, October 25,1860, so that the question is, Were the defendant Indians, or any separate and distinct band thereof, to which the depredating Ipdians belonged, in amity with the Dnited States at that time?
In the case of Thomas Espey, No. 4410, the court recently found that the Comanche Indians were not in amity with the United States in February and during the fall of I860.
That finding covers the time of the depredation in this case, and therefore, unless the same was committed by Indians belonging to a different, separate, and recognized political entity as a band or tribe of Comanche Indians then in amity with the Dnited States, the motion will have to be sustained.
This leads us to inquire as to the identity of the particular Indians committing the depredation; and in this respect the evidence satisfies the court that the depredation was committed at the time alleged, a few miles north of the Brazos Biver, in Palo Pinto County, Tex., by about thirty Indians whose habitat at the time was on their reservation at Fort Cobb, in the Indian Territory, under the agency of Colonel Deeper.
The evidence shows very clearly that the depredators were Comanche Indians; that they were trailed by a number of citizens in the direction of their reservation, some of whom saw the Indians on the march, with the stock, and about two years thereafter some of the claimant’s horses bearing his braud were seen in the possession of the' Indians on that reservation.
The depredation having been committed by Comanche In *102 dians located on tbe Fort Cobb Reservation, tbe next question is, What particular band or tribe of Com anches, if any, were they?
In tbe reports of tbe Secretary of tbe Interior and tbe Commissioner of Indian Affairs for 1854,1855, and 1856, it will be observed that tbe State of Texas bad granted reservations upon which to colonize and locate tbe Indians in that State and that such colonization commenced in February, 1855. Tbe reservations were situate in Young County, one on tbe Brazos River and another on tbe “Clear Fork of tbe Brazos,” on which latter, called tbe “ Comanche Reserve,” were located tbe Comanche Indians. (Report Commissioner of Indian Affairs, 1856, p. 14.)
From this time until tbe removal of these Indians to their reservation in tbe Indian Territory various troubles arose between them and tbe citizens of Texas, principally growing-out of tbe murders and depredations committed on them and their property by tbe Indians, but which were denied by tbe Indian agent in charge.
Tbe governor of Texas appointed a commission to inquire into tbe troubles, and that commission, after a full investigation, reported in substance that tbe Indians located on tbe two reservations named bad been guilty of numerous thefts and some murders. (Report Commissioner of Indian Affairs, 1859, pp. 298, 299.)
These lawless acts so aroused tbe opposition of tbe citizens that troops were necessary to protect tbe Indians from violence, and in May thereafter a plan was suggested by tbe superintendent of Indian affairs■ for Texas for their removal, saying, among other things, that “the Comanches would, of course, have to be located separate from tbe others, as I presume it will be tbe wish of tbe Department to associate tbe more northern Comanclies with them whenever they can be induced to settle down.” (Report Commissioner of Indian Affairs, 1859, p. 367.)
In June following tbe superintendent named was directed to remove tbe Indians located on their reservations in Texas to tbe Indian Territory and locate them on their new reservation, thereafter known as tbe Wichita Agency, on tbe Wichita River, “west of tbe ninety-eighth degree of west longitude,” which was procured by tbe provisions of tbe ninth article of tbe treaty with tbe Choctaws and Obickasaws, June 22,1855 *103 (11 Stat. L., 611, 613), and to aid Mm in sucb removal lie was instructed to take along Agent Leeper, of the “ Comanche •Reserve.” (Ibid., 283.)
Previous to this (February 1, 1859) Agent Leeper reported that “ the State of Texas has only granted xiermission for Indians properly belonging to Texas to settle upon this reserve; therefore there is but little or no probability of any of the Comanche Indians being settled here, except the Pennetakas, they being the only band of Gomanches’who are regarded as Texas Indians.” (Report Commissioner of Indian Affairs, 1859, p. 250.)
The following year the same agent, reporting as to the condition of these Indians at the Wichita Agency, said:
“ The Oomanches have no land in cultivation, but have split and piled 7,800 rails. They have no horses worthy of remark. Their habitations consist of scattered tents and a few lodges covered with grass. (Report Commissioner of Indian Affairs, 1860, p. 381.)”
In 1840 a treaty was negotiated at Council Springs, in Robinson County, Tex., with the Comanche and other Indians then probably inhabiting Texas. (9 Stat. L., 844.)
In 1853, at Fort Atkinson, in the Indian Territory, a treaty was also negotiated with the Comanche, Kiowa, and Apache Indians “inhabiting the said territory south of the Arkansas River.” (10 Stat. L., 1013.)
It will thus be seen that about six years before the Comanche Indians of Texas were removed therefrom to their new reservation in the Indian Territory a treaty was negotiated with their more northern brethren south of the Arkansas in said Territory.
The Comanche Indians in Texas were thus recognized by treaty as distinct from those inhabiting the Indian Territory south of the Arkansas, and from the report of Agent Leeper referred to it appears that the only Comanche Indians settled on the reservation stated in 1859, or that were regarded as Texas Indians, was the Pennetaka band. Hence we conclude that the Comanche Indians of Texas with whom the treaty of 1846 was negotiated included the Pennetaka band, and that it was this band that was removed to a reservation on the Wichita River at Fort Cobb, afterwards known as the Wichita Agency (Report Commissioner of Indian Affairs, 1860, p. 309), from which Agent Leeper made his report of September 26, 1860, hereinbefore referred to. (Ibid., 381.)
*104 From tbe report of the Commissioner of Indian Affairs, 1859, it will be noticed that the Kiowa and Comanche Indians upon, the Arkansas occupied for many years the country between the Arkansas and the Canadian rivers, far remote from the Comanches of Texas (p. 138), who, as we have seen, were permitted to reside on a reservation in that State until removed north in 1859.
Separate appropriations were made for the Comanche or Texas Indians from 1858 to 18C2, as will be seen by reference to 11 Statutes at Large, pages 277, 392, 400, and 12 Statutes at Large, pages 48, 56, 224, 236, 515, 527.
In the appropriation act of June 29, 1860 (12 Stat. L., 56), it is provided:
“ Indian service in the district of country leased from the Choctaws for the Indians lately residing in Texas. — For the expeiises of colonizing, supporting, and furnishing agricultural implements and stock; pay of necessary employees; purchase of clothing, medicine, iron, and steel; establishment and maintenance of schools; and building houses for the Indians lately residing in Texas, in lieu of those abandoned in that State, to be expended under the direction of the Secretary of the Interior, forty-five thousand six hundred and fifty dollars.”
It will thus be seen that the Comanche Indians of Texas, including the Pennetaka band, as well as the Oomanches on the Arkansas, were recoguized as separate and distinct tribes or bands both by treaty and by appropriations; i. e., as Comanche Indians inhabiting different and remote regions of country. ■
The Pennetaka band was also recognized as a separate and distinct band in the treaty concluded October 18,1865, on the Little Arkansas with the various bands of the Kiowa and Comanche Indians, in which three chiefs of the Pennetaka band united therewith on its behalf. (14 Stat. L., 717, 720.)
These recognitions both by treaty and by appropriations differentiate the present case from the Gamel Case, wherein the defendants contended that the reference to the Quohada Comanche Indians, in the various reports of the military and civil officers, was such a recognition as to constitute them a separate political entity. The court, nevertheless, was satisfied as a matter of fact that they were Indians merely “out or away” from their reservation, and for that reason designated by the Indians as Quohadas; i. e., the outs.
In such case the court reached the conclusion that the Co *105 manche tribe, to which such Quohada (out) Indians belonged, should be held responsible for their acts.
In the Tully Case (32 C. Cls. R., 1) the Arivaipa band of Apache Indians was not only recognized in the reports of various officers, but was being supplied with provisions, as stated in the opinion, and for those reasons was held to be a separate political entity, responsible for its acts and those of its members.
The Pennetaka band was the converse of Victoria’s band. If this band had been carrying on a war with the United States and all others of the Comanche race had been in amity, the present case would have to be dismissed under the decision in the Montoya Case (32 C. Cls. R., 349).
Having reached the conclusion that the depredation complained of was committed by Comanche Indians from their reservation in the Indian Territory, to which they had been removed in 1859 from their Texas home on the Brazos Eiver known as the “Comanche Eeserve,” and that the only Comanche Indians on the “Comanche Eeserve” were those of the Pennetaka band, the remaining question is, Was .the band in amity with the United States at the time of the depredation?
The defendants have referred us to various reports found in the reports of the Secretary of War and the Secretary of the Interior for 1859, 1800, and 1861 in respect of the unfriendly attitude of the Comanche Indians during the years named, but from a careful reading of them we are satisfied that the Comanche Indians therein referred to were those located and roaming between the Arkansas and Canadian rivers, and designated in the reports- and in the appropriation acts referred to as Comanche Indians on the Arkansas Eiver, as con-tradistinguished from the Comanche Indians of Texas.
In the Eeport of the Commissioner of Indian Affairs for 1859, page 506, he refers to the Kiowa and Comanche Indians as having “for two years appeared in full numbers and for long periods along the Arkansas, and now permanently occupy the country between the Canadian and the Arkansas rivers.” The reports, both civil and military, show that the region stated continued to be their habitat until after the depredation in this case. (Report Secretary War, 1859, p. 3; for 1860, pp. 3 to 21; Eeport Secretary Interior for 1860, p. 452.)
We are satisfied that the Comanche Indians referred to in the reports cited include only those on the Arkansas. No *106 report or other evidence is cited, nor have we been able to find any report connecting tbe Pennetaka band of Comanche' Indians with the hostile or other acts of the Oomanches on the Arkansas Biver. As the Pennetaka band, defendant herein, was under treaty relations as before stated, the presumption is that it was in amity with the United States at the date of the depredation aforesaid, and the court so holds.
As they were therefore in amity the court must entertain jurisdiction, though the main body of the Comanche tribe were at war.
The defendants’ motion for a new trial is therefore overruled.
Following the decision in the Graham Case (30 C. Cls. R., 318, 340) the judgment as rendered is to stand with the additional finding of fact sjiecified in the order of the court this day filed.
Howry, J., was not present when this case was tried, and took no part in the decision.