Peelle, J.,
delivered the opinion of the court:
In the original petition filed herein April 14, 1891, it is averred, among other things, in substance, that on the 9th of September, 1872, property of the value of $1,000, belonging ■to the claimant, a citizen of the United States, was taken by Indians belonging to the Sioux tribe or nation, then in amity with the United States; and that a claim for said qiroperty, with evidence therein, was presented to the Commissioner of Indian Affairs, and thereafter, January 5, 1888, reported to Congress by the Secretary of the Interior as allowed in the sum of $750.
To the petition thus filed the defendants answered by the general traverse.
Thereafter, to wit, November 28,1892, neither party electing to reopen the allowance thus made, an agreed stipulation was signed by the parties and filed in the cause in these words:
“It is hereby stipulated and agreed on the part of claimant in the above-entitled cause by Sanborn & King, attorneys of record, and on the part of the Government by L. W. Colby, Assistant Attorney-General, in charge of Indian depredation cases, that the following facts are shown by the original papers, evidence, records, and reports from Governmental Departments on file in the office of the clerk of said court:
“I. That Jeremiah Graham, the original claimant, was, at the time of the commission of the depredations complained of, a citizen of the United States.
*330 “II. That on the 9th day of September, 1872, at or near Fort Laramie, certain Indians belonging to the said Sioux tribe, band, of nation took or destroyed property belonging to the said original claimant without just cause or provocation on the part of the owner or agent in charge, and that the same has not been returned or paid for, and was at said time and place of the value of $750.00.
“III. That the said Sioux tribe, band, or nation of Indians were, at the time of the commission of said depredations, in amity and treaty relations with the United States.
“ IY. That on the 19th day of December, 1887, a claim for said property so taken or destroyed was examined, approved, and allowed by the Secretary of the Interior, or under his direction, in pursuance of the act of Congress making appropriations for the current and contingent expenses of the Indian Department, and for fulfilling treaty stipulations with various Indian tribes for the year ending June 30, 1886, and for other purposes, approved March 3, 1885, and subsequent Indian appropriation acts, in the sum of $750.00, in favor of said Jeremiah Graham, and thereafter reported with such allowance to Congress by Executive Document No. 31 of the 1st session of the 50th Congress of the United States as claim No. 1199.
“Y. That-
“ YI. That neither the said claimant nor the United States elects to reopen said case and try the same before the court, but the claimant is willing to accept said allowance in full satisfaction and settlement of said claim, and asks to have judgment rendered therefor by said court under the act of Congress approved March 3,1891, entitled ‘An act to provide for the adjudication and payment of claims arising from Indian depredations.’
“ Sanborn & King-, Attorneys for Claimant.
“L. W. Colby, Assistant Attorney-General.”
The claim having been examined and allowed under the Act March 3, 1885 (23 Stat. L., 376), was entitled, under the provisions of the Act March 3, 1891 (26 Stat. L., 851, sec. 4), to priority of consideration by the court; and under the provisions of the same section, neither party electing to reopen the case as set forth in the stipulation, it became the duty of the court, nothing appearing to the contrary, to render judgment for the amount against the United States and the Sioux tribe, band, or nation of Indians, which was accordingly done on the 5th day of December, 1892.
Thereafter, to wit, on the 4th day of December, 1894, the defendants filed their motion for a new trial, setting forth that *331 wrong and injustice bad been done tbe United States by reason of tbe judgment so rendered in tbis :
“1. Suit may not be maintained nor judgment rendered against tbe Sioux Indians as a tribe.
112. Tbe depredation wbicb forms tbe basis of tbis suit was not committed by tbe Sioux tribe of Indians.
“3. Tbe Secretary of tbe Interior was without authority to allow said claim.
' “4. Tbe stipulation for judgment was without authority of law.
“5. In entering judgment pro forma tbe court was without jurisdiction, and said judgment operates as a wrong and injustice to tbe United States and tbe other defendants.”
By tbe Act March 3, 1891 (supra), under wbicb tbis suit was brought, section 3 provides “that all claims shall be presented to tbe court by petition, setting forth in ordinary and concise language, without unnecessary repetition, tbe facts upon wbicb such claims are based, tbe persons, classes of persons, tribe or nation or band of Indians by whom tbe alleged illegal acts were committed, as near as may be.”
And in tbe petition it is averred that tbe property for wbicb compensation is sought “ was taken by Indians belonging to tbe Sioux tribe or nation then in amity with tbe United States,” and judgment was rendered against tbe Sioux tribe, band, or . nation of Indians in accordance with tbe agreed stipulations filed.
Tbe defendants contend that tbe Sioux Indians, as a tribe or nation bad no recognized political entity or corporate existence at the date of the depredation complained of and have not since bad, and are therefore not suable.
Tbe Sioux are by far tbe most numerous of any tribe or nation of Indians in tbe United States, numbering over 40,000, or perhaps one-sixth of all tbe Indians in tbe United States, and while tbe nation is composed of different tribes or bands, they have always been recognized by tbe political departments of tbe Government as belonging to tbe Siouan family or race.
Tbe common designation or name Sioux appears in all tbe treaties with tbe United States, whether made with them as a nation or with tbe different, tribes or bands composing the nation.
Whatever other name is used or referred to in tbe treaties to identify them locally, tbe common or family name Sioux is also *332 invariably used, and by this name they have been identified from the first'.
The defendants’ counsel has obliged us with a list of the treaties made with these Indians, which we have verified and found to be correct, the first of which was negotiated in 1805 with “ the Sioux nation of Indians.” This treaty, though it does not ap'pear to have been ratified, was published by the Bureau of Indian Affairs in a volume entitled Compilation of Indian Laws, page 316.
Subsequent to this time treaties were proclaimed with them as tribes, bands, or nation, as will appear from the following:
“Sioux’s of the Lakes, December 26, 1815. (7 Stat. L., 126.)
“ Siouxs of the Biver St. Peter, December 26, 1815. (7 Stat. L., 127.)
“Siouxs of the Leaf, the Siouxs of the Broad Leaf, and the Siouxs who Shoot in the Pine Tops, December 30, 1816. (7 Stat. L., 143.)
“Teton, Yancton, and Yanetonais tribes of the Sioux, February 6, 1826. (7 Stat. L., 250.)
“ Sioune and Ogallala bands of Sioux Indians, February 6, 1826. (7 Stat. L., 252.)
“Huncpapas band of the Sioux Indians, February 6, 1826. (7 Stat. L., 257.)
“ Sioux in Michigan, February 6,1826. (7 Stat. L., 272.)
“Medawakanton, Wakpacoota, Wakpeton, and Sissetong bands or tribes of the Sioux Indians, February 24, 1831. (7 Stat. L., 328.)
“Wahaskaws of the Sioux tribe of Indians, February 15, 1837. (7 Stat. L., 510.)
“Yankton and Santee bands of Sioux Indians, February 15, 1837. (7 Stat. L., 524.)
“Sioux of the Mississippi Valley, June 15, 1838. (7 Stat. L., 538.)
“Yankton tribe of Sioux Indians, February 21,1838. (7 Stat. L., 542.)
“Med ay wa kan toan and Wak pay koo tay bands of Dakota or Sioux Indians, of Minnesota, August 5, 1851. (10 Stat. L., 954.)
“ See see toan and Wah pay toan bands of Dakota or Sioux Indians, August 5, 1851. (10 Stat. L., 949.)
“ Yancton tribe of Sioux or Dakotah Indians, February 26, 1859 (11 Stat. L., 743.)
“ Mendawakanton and Wahpakoota bands of Dakota or Sioux tribe of Indians, March 31,1859. (12 Stat. L., 1031.)
“Sisseeton and Wahpaton bands of the Dakota or Sioux tribe of Indians, March 31, 1859. (12 Stat. L., 1037.)
“Minneconjou band of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 695.)
*333 “Lower Brulé baud of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 699.)
“ Two Kettles band of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 723.)
“ Blackfeet band of Dakota or Sioux Indians, March 17, 1877. (14 Stat. L., 727.)
“Sans Arcs band of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 731.)
“Yanktonai band of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 735.)
“ Onkpahpah band of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 739.)
“Upper Yanktonais band of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 743.)
“ O’Gallala band of Dakota or Sioux Indians, March 17, 1866. (14 Stat. L., 747.)
“ Sissiton and Warpeton bands of Dakota or Sioux Indians, May 2, 1867. (15 Stat. L., 505.)
“ Brulés, O’Gallalas, Minneconjons, Yanetonais, Uncpapas, Blackfeet, Two Kettles, Cut Heads, Santee, and Sans Arcs bands of the Sioux Nation of Indians, February 16, 1869. (15 Stat. L., 635.)”
Referring to these treaties with the separate bands of the Sioux Indians, the Commissioner of Indian Affairs in his report for 1891 (vol. 1, p. 187) says:
“These treaties with scattered portions of the Sioux seem to have produced little result, and prolonged war with the tribe over large sections of country was brought to a close only by the well-known treaty at Fort Laramie, in 1868, with representatives of the Sioux Nation as a whole, except that portion which has always remained in the region of Montana.” * * *
This is the last of the treaties referred to in the foregoing-list.
* By article 2 thereof a common reservation was set apart to them and by the terms of article 17 all treaties theretofore entered into between the respective parties, whereby the United States were obligated to provide money, clothing, or other articles of property to such Indians, were thereby abrogated and annulled, but no further.
By this treaty “with the representatives of the Sioux Nation,” i. e., the chiefs and headmen of the “different bands of the Sioux Nation of Indians,” they are recognized in their dual capacity as a nation and as separate bands composing the nation. And when that national or tribal relation has been established by the political departments the courts are bound by it. (United States v. Holliday, 3 Wall., 407.) Not *334 that Indians under treaty relations only are suable under tbe act 1891, but that by such treaties the relations of the Indian's in their organized or tribal capacity is thereby fixed and recognized. (Kansas Indians, 5 Wall., 737.)
Therefore, we think it clear that under the Indian Depredation Act, March 3, 1891 (supra), suit may be maintained against the Sioux Indians as a tribe or nation; and if in such suit the evidence should show that the depredation was committed by Indians belonging to such tribe or nation, without more particular identification, we think a judgment may properly be rendered against them as a tribe or nation.
The defendants further and perhaps principal contention narrowed down is, that where the evidence shows, as in this case, that the depredation complained of was committed by a band of Indians, recognized as such by treaty, suit may not be maintained or judgment rendered against the tribe or nation of which such band is a part, though such tribe or nation is a party defendant, but that such band should, by name, be made a party defendant with the United States, and judgment, if at all, be so rendered.
This involves the question as to whether or not the various bands composing the tribe or nation of Indians are in court for the purpose of a judgment when the tribe or nation of which they are a part is made a defendant.
In support of this contention counsel cites the Woolverton Case (29 C. Cls. R., 107). In that case the Nez Perces tribe was the only defendant joined with the United States, while the Indians who comjnitted the depredation were Joseph’s band of Nez Perces Indians, then in a state of war and actual hostilities with the United States, and hence the petition was properly dismissed if there had been no other reason therefor.
But on examining the findings it will be seen that while Joseph’s band was a part of the tribe at the time of the treaty of 1855 and down to the treaty of 1863, they severed their connection with the tribe at the latter date, refused to become parties to the treaty, and have since been recognized by the President and by the Secretary of the Interior as a separate and distinct tribe, receiving no benefits under treaty provisions with the Nez Perces tribe, having no interest in their reservation in Idaho, and occupying a reservation set apart to them in a different State (Washington).
*335 This finding (3) is tbe justification for tbe court’s statement in tbe opinion at page 110:
“Tbe defendant Indians are not liable, because they did not commit tbe depredation. Tbe United States are not liable, because tbe Indians wbo committed tbe depredation, and wbo were perfectly well known, bave not been made parties to tbe suit. It is a fatal misjoinder of tbe responsible party.”
There is nothing in the' case to warrant the inference that if other Indians recognized as members of tbe tribe bad committed tbe depredation judgment would not bave been rendered against tbe tribe.
In tbe Leighton Case (id., 288-330) tbe Ogallala band, against whom judgment was rendered, was with other bands and tribes ■made defendants, and judgment was rendered against tbe band, distinct from tbe tribe of which it was a member, for tbe reasons stated in tbe opinion of tbe court:
“Tbe defendant, tbe Ogallala band of tbe Sioux tribe of Indians, having been in separate treaty relations with tbe United States at tbe time of tbe depredation set forth in tbe findings, and Congress having, by the act of 1891, recognized such band in the jurisdictional requirements of the act as to amity, we think it was intended by Congress that the band should be held liable for tbe value of tbe piroperty so taken, notwithstanding tbe provisions of sections 5 and 6 of tbe act concerning judgments against the tribe. . And especially do we think this correct since all tbe other bands of tbe tribe may bave been engaged in war at tbe time of tbe depredation, and for that reason not in amity with tbe United States. Where tbe political departments of tbe Government -have recognized a band for tbe purpose of a treaty and provided therein for the payment of annuities to such band separate and distinct irom tbe annuities paid to tbe tribe or other bands of tbe tribe,, we think it a sufficient recognition of tbe band to warrant a judgment against it.”
Tbe evidence shows that tbe depredation complained of was committed by tbe Minneconjou band of Sioux Indians on tbe 9th of September, 1872.
Prior thereto, to wit, March 17, 1866 (14 Stat. L., 695), as set forth in tbe foregoing list, a treaty was proclaimed between tbe United States and tbe Minneconjou band of tbe Dakota or Sioux Indians, whereby they acknowledged themselves subject to tbe exclusive jurisdiction and authority of the United States, and bound themselves not only to cease all hostilities against *336 the citizens of the United States, but to use their influence, with force if necessary, to prevent other tribes from making hostile demonstrations; and if controversies involving peace or war with other tribes should arise they obligated themselves to submit the same for decision to the President.
The band also agreed to withdraw from the routes overland already established or to be thereafter established, “and in consideration thereof the Government'of the United States agree to pay said band the sum of $10,000 annually for twenty years, in such articles as the Secretary of the Interior may direct.”
By reference to the last treaty (1868), which is referred to in the above list (15 Stat. L., 635), it will be seen that the Minneconjou band was one of the ten bands of the Sioux Nation of Indians who signed that treaty on behalf of themselves and of the nation of which they are a part.
By article 17 of this treaty so much of the treaty of 1866 as obligated the United States to furnish and provide money, clothing, or other articles of property to the Minneconjou band, as before stated, was abrogated and annulled, but no further.
So that in effect the separate treaty with the band was otherwise continued in force.
By article 10 the United States agreed that in lieu of all sums of money or other annuities provided for by former treaties (1866) certain clothing therein specified should be furnished to each Indian, and in addition thereto the sum of $10 for each person entitled to the beneficial effects of the treaty for the period of thirty years for such as roam and hunt, and $20 per year to those who engage in farming, etc.
The Minneconjou band of the Sioux Nation of Indians, therefore, has been recognized by the political departments of the Government both by separate treaty and with other bands composing the Sioux Nation.
The Indians being subject to the jurisdiction and control of the United States as “ domestic dependent nations,” they have no standing in the courts either as plaintiff or defendant except by statute, and under the act 1891, then only with the strong arm of the United States, as was held substantially in the Jaeger Case (27 Cls. R., 278).
The act makes the Attorney-General their sole legal adviser in all proceedings thereunder, unless, with the consent of the *337 Commissioner of Indian Affairs, they employ counsel to assist him, as provided by the second proviso to section 4.
No notice is required to be served on the Indian defendants except through the Attorney-General, though by section 3 claimants are-required to state in their petitions the “tribe or bands of Indians by whom the alleged illegal acts were committed, as near as may be.”
Section 4 provides that “ the service of the petition shall be made upon the Attorney-General of the United States in such manner as may be provided by the rules or orders of said court,” and when service bas been so had it is made “ the duty of the Attorney-General of the United States to appear and defend the interests of the Government and of the Indians in the suit.”
When a claimant has complied with the provisions of section 3, by averring “the persons, classes of persons, tribe or tribes or bands of Indians by whom the alleged illegal acts were committed, as near as may be,” he has thereby made snch Indians parties defendant for the purpose of a judgment within the meaning of the act 1891; and such averment is sufficient notice to the Attorney-General as to the Indians whose interests the act makes it his duty to defend.
“The interests of the Government and of the Indians in the suit” are so linked together that if fraud, wrong, or injustice has been done the tribe, band, or nation in any judgment rendered against them and the United States, such fraud, wrong, or injustice will necessarily apply to the United States, as by the act it is not only made the 'duty of the Attorney-General to defend the interests of such Indians, but thereby the United States assume jointly with them existing liability and maybe required to pay the whole judgment, as set forth in section 6.
The judgment as it stands, though rendered in the alternative, makes all the bands composing the Sioux Nation liable for the payment thereof, although but one of them committed the depredation.
If all the other bands of the nation had been engaged in actual war against the United States at the time of the depredation, it is clear that under the former decisions of this court, to which we adhere, judgment against them, either as a nation, tribe, or as bands, would be erroneous; and if such bands had been in amity with the United States, while the band to which *338 the depredating Indians belong was engaged in actual war, no judgment could be rendered against either.
And if in a suit brought it should be averred in the petition that the depredation was committed by Indians belonging to an unknown tribe or nation, and the evidence should identify a particular band as responsible for such depredation, though engaged at the time in actual war, the petition would have to be dismissed, although nine other bands belonging to the same tribe or nation were in amity with the United States.
The nation can not be. held liable for the illegal acts of the tribe, nor the tribe for the illegal acts of the band, when the Indians committing the depredation can be identified as belonging to a particular tribe or band.
As was said in the Leighton Case (supra), “Congress having by the act 1891 recognized such band in the jurisdictional requirements of the act as to amity, we think it was intended by Congress that the band should be held liable for the value of the property so taken, notwithstanding the provisions of sections 5 and 6 of the act concerning judgments against the tribe.”
In view of the evidence in the case which identifies the particular band responsible for the depredation, and what we have said, it follows that the judgment, though valid, is technically defective, as to the defendant Indians in this, that the Sioux tribe or nation of Indians therein referred to should have been designated as “the Minneconjou band of the Sioux Nation of Indians.”
But at this point the defendant’s counsel contends that the correction can only be made by setting aside the judgment, and that then judgment can not be rendered against the band as indicated without an amendment to the petition making the band a party defendant by name, and that, inasmuch as the time provided by the second proviso to section 2 within which to file a petition has expired, it is now too late to so amend.
Ordinarily, this contention would be well taken, but iu view of the peculiar relations of the Indians to the United States, whose financial trustee they are, and their recognition by the political departments of the Government as a nation of Indians ■composed of different bands; and from what we have already ■said, we think that under the act when the tribe or nation is made a defendant, as in this case, the different bands named *339 in the treaty as composing the nation are brought into court as defendants and are duly represented by the Attorney-General; and that when the evidence, as in this case, identifies the particular band belonging to and forming a part of such tribe or nation as responsible for the depredation, the Attorney-General is thereby informed of the fact, and judgment may be rendered against the band without further amendment.
In the condition of this case, however, we do not think it necessary to set aside the judgment and then render judgment anew against the United States and the Minneconjou band of the Sioux Nation of Indians, as the judgment already rendered includes such band; and we think the technical defect may be reached by adding an additional finding- of fact with reference thereto, thereby segregating the responsible band for the information and guidance of the Department in carrying out the provisions of section 6 of the act.
This course will, we think, effectuate the purpose of the act in giving claimants their day in court and at the same time protect “ the interests of the Government and of the Indians in the suit.”
The claimants look to the United States rather than to the Indians for the payment of any judgments rendered in their favor; and, inasmuch as the liability of the United States, though secondary, depends upon the citizenship of the claimants and the amity of the Indians committing the depredation, they will, in the payment of such judgments, always be in position to protect themselves to the extent of any money due or to become due to such Indians as provided in section 6.
In many cases, however, judgments against the Indians will amount only to a means of identifying them for future adjustment, as they are without means; and appropriations “for their current and necessary support, subsistence, and education” can not be used for the payment of such judgments. However, these are matters of bookkeeping in the Treasury Department.
On the argument of the motion for a new trial the defendant’s counsel did not controvert the citizenship of the claimant, the amity of the Indians, nor the value of the property represented by the judgment, and neither is assigned as a reason for a new trial; and therefore it is immaterial to inquire as to whether or not the Secretary of the Interior had authority to *340 examine and allow the claim under the act March 3, 1885, for, if the judgment is otherwise correct, though technically defective as to the particular Indians against whom the judgment is rendered, it will not be disturbed on that ground.
Having reached the conclusion we have, the motion for a new trial is hereby overruled.
The judgment as rendered is to stand, with the additional finding of fact specified in the order of the court this day filed.