**Frank B. JAMES, et al., Appellants,**

v.

**UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.**

No. 85–5920.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 9, 1986.

Decided July 24, 1987.

As Amended July 24, 1987.

William A. Hahn, with whom Robert C. Hahn, Boston, Mass., was on brief, for appellants.

Amelia S. Salzman, with whom Edward J. Shawaker, Dept. of Justice, Washington, D.C., was on brief, for appellees. Joseph E. diGenova, U.S. Atty., R. Craig Lawrence, John H. Palmer, Jr., and Royce C. Lamberth, Asst. U.S. Attys., Washington, D.C., also entered appearances for appellees.

Before WALD, Chief Judge, MIKVA, Circuit Judge, and LEIGHTON,* Senior District Judge.

Opinion for the Court filed by Senior District Judge LEIGHTON.

LEIGHTON, Senior District Judge:

This appeal presents two issues. First, whether the district court correctly dismissed appellants' suit against the United States Department of Health and Human Services after the court ruled that appellants did not have standing to sue on the claim alleged in their complaint. Second, whether the district court correctly dismissed appellants' suit against the United States Department of the Interior because they did not exhaust administrative remedies. We hold that appellants' claim against the Department of Health and Human Services is moot; therefore, we do not reach the issue whether the dismissal for lack of standing was correct. As to appellants' claim against the Department of the Interior, we conclude that the district court correctly rejected their request for an order that the Interior add the Gay Head Wampanoags to its list of federally recognized Indian tribes, because appellants failed to exhaust administrative remedies which may have obtained the relief sought. For these reasons we affirm the district court's dismissal order.

## I

The Gay Head Indians of Martha's Vineyard, Massachusetts, are the descendants of the Gay Head Wampanoags who have inhabited the area since 1642. They have been commonly known as American Indians from historical times until the present. In 1822, under a presidential commission, Reverend Jedidiah Morse prepared a report on the actual state of Indian tribes. He discussed the Gay Headers; in a statistical table of all Indian tribes within the limits of the United States, he included the Martha's Vineyard Indians, the Wampanoags. In 1826, Colonel Thomas L. McKenney of the Office of Indian Affairs submitted a report to the Secretary of War listing the different tribes of Indians within the limits of the several states and territories. He listed the Martha's Vineyard Indians of Massachusetts, numbering some 340, who resided in their respective reservations. In May 1834, the United States House of Representatives Committee on Indian Affairs issued a report listing the Indians of New

---

* Of the United States District Court for the Northern District of Illinois, sitting by designation pursuant to 28 U.S.C. § 294(d) (1982).

England, then numbering some 2,562, as among the tribes east of the Mississippi who had not agreed to be removed west of the river. Pursuant to a statute Congress enacted on March 3, 1847, Dr. Henry R. Schoolcraft prepared a report for the Bureau of Indian Affairs which was adopted. Among the tribes of the United States, he included the Gay Head Indians.

There is historical evidence that between 1827 and 1870, these Indians continued to maintain some tribal authority through concensus of a general council. They continuously petitioned the authorities in Massachusetts during this period. Commonwealth records disclose that between 1814 and 1862, Massachusetts acknowledged that the Gay Head Indians were essentially autonomous and self-governing. In the latter year, the Commonwealth imposed greater jurisdictional control over them by establishing Gay Head as an Indian District; full citizenship was extended to the Indians in 1869. In 1870, Massachusetts incorporated Gay Head as a township.

In November 1972, ten members of the Gay Head Tribe, including some of the appellants in this case, associated themselves with the intention of forming a corporation under the name of Wampanoag Tribal Council of Gay Head, Inc. ("the Tribal Council"). On January 10, 1973, the Secretary of the Commonwealth issued the group a charter for a not-for-profit corporation, one of the purposes of which was "to obtain Federal recognition for the Gay Head Indians." The group was led by Donald A. Widdiss, the tribal coordinator, and his wife, Gladys A. Widdiss, who became president of the corporation. In this case, they are known as the "Widdiss Group," dominated by the Widdiss Family and described by appellants "as the more 'establishment' oriented"; appellants are known as the "James Group," members of the Tribe who were "traditionalists." There exists between the two groups an intra-tribal struggle for leadership of the Gay Head Wampanoags.

On October 30, 1983, the governing body of the Tribal Council adopted a resolution authorizing officers of the corporation to apply for a grant from the Administration for Native Americans, a program operated by the Department of Health and Human Services under the Native Americans Program Act of 1974, 42 U.S.C. § 2991 *et seq.* The purpose of the grant was to enable the Tribal Council to establish the identity of the Gay Head Indian peoples, that is, determining which individuals were descendants of the Tribe, where they were located, and information relevant to such determination. The application was approved and a grant of $75,000 was made to the corporation for a budget period from February 1, 1984 through January 1, 1985. This application was followed by one made by the Tribal Council to the Indian Health Service, a component of the Health Resources and Services Administration within the Department of Health and Human Services. This application resulted in an award of a $99,999 contract for the purpose of enabling the corporation (1) to perform a health assessment of all members of the tribal population in the immediate service area; (2) to make the tribal members, the contract staff, and local health care providers aware of the Indian Health Service benefits, as well as applicable rules, procedures and benefits; and (3) to begin development of a health management system to plan, organize, coordinate and evaluate health services delivery. The contract was granted under the Buy-Indian Act, 25 U.S.C. § 47.

On October 12 and 24, 1984, two of the attorneys who represent appellants in these proceedings wrote to the Secretary of Health and Human Services, and to the responsible official of the Indian Health Service, protesting the two awards and demanding that funding be terminated. The grounds asserted were that the Tribal Council was not authorized to represent the Gay Head Indians, and had procured the awards through fraudulent representations. The demands for termination were later rejected by responsible officials of the department. On February 4, 1985, appellants, numbering some 50 members of the Gay Head Wampanoags, filed suit in this case against the Department of Health and Human Services. They alleged existence of the intra-tribal rivalry between them and

the Widdiss Group which controlled the Tribal Council. Appellants alleged that the Widdiss Group had obtained, without authority and by fraudulent representations, the two Department of Health and Human Services awards. They prayed for a preliminary and permanent injunction against expenditure of the federal funds and for a declaratory judgment that refusal to terminate the awards to the Widdiss Group was arbitrary and capricious, a breach of the trust responsibility of the United States to American Indians and contrary to applicable law.

The department moved to dismiss on the ground that appellants lacked standing to assert the claims they alleged in their complaint. At about the same time, appellants moved for a preliminary injunction. The Widdiss Group, acting for the Tribal Council, made a motion to intervene in the suit. The district judge heard the parties, denied appellants' motion for preliminary injunction and took under advisement the department's motion to dismiss and the motion to intervene. During the hearing, the district judge expressed some reservation on the issue of federal recognition of the Gay Head Indian Tribe by the federal government. As a consequence, appellants filed an amendment to their complaint adding the Department of the Interior as a defendant and prayed that a declaratory judgment be entered holding that the Interior's failure to include the Gay Head Wampanoag Indian Tribe of Martha's Vineyard, Massachusetts, on its list of federally recognized Indian tribes was arbitrary, capricious, an abuse of discretion, a breach of the United States' trust responsibility to American Indians and contrary to applicable law. They also sought an order directing the Interior to place the Gay Heads on the list of recognized tribes.

The Department of the Interior appeared and moved to dismiss on the ground that appellants had failed to exhaust available administrative remedies. The department contended that because appellants had not applied for recognition under its published rules and regulations, they were not entitled to a judicial declaration that the Gay Head Wampanoag Tribe was federally rec-

ognized. On August 15, 1985, the district judge in an unpublished memorandum, granted the two motions to dismiss and held that the motion to intervene was moot. He ruled that appellants lacked standing to assert the claim they alleged against the Department of Health and Human Services and, with regard to their claim against the Department of the Interior, that they were not entitled to the relief sought because they had not exhausted available administrative remedies. This appeal followed.

## II

Because of the passage of time since this suit was filed, a threshold question exists concerning whether appellant's request for declaratory and injunctive relief against the Department of Health and Human Services is now moot. The Administration for Native Americans grant expired in August 1986, and the Indian Health Service contract has been fully performed. The grant has not been renewed and no new contract has been awarded; the issue of possible renewal was raised at oral argument and no pending renewal applications were revealed by counsel. In light of this, we must determine whether a sufficiently live controversy between the parties exists so as to confer this court with jurisdiction. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *Maryland Peoples Counsel v. Federal Energy Regulatory Commission*, 761 F.2d 768, 773 (D.C.Cir. 1985).

The expiration of the specific action appellants complain of clearly renders the request for injunctive relief moot and would ordinarily render their request for declaratory relief moot as well, at least as it relates to the claim against the Department of Health and Human Services. *Conyers v. Reagan*, 765 F.2d 1124, 1127 (D.C. Cir.1985); *Flynt v. Weinberger*, 762 F.2d 134, 135 (D.C.Cir.1985). However, when challenged action is capable of repetition yet evading review, a cause is not moot. *E.g., Southern Pacific Terminal Co. v. I.C.C.*, 219 U.S. 498, 515, 31 S.Ct. 279, 283,

55 L.Ed. 310 (1911). The "capable of repetition" doctrine is limited to situations where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975). In this case, while the challenged action is arguably too short in duration to be fully litigated prior to expiration, there is no reasonable expectation that appellants will again be subjected to the same action.

In order to satisfy the reasonable expectation factor, there must exist not merely a "physical or theoretical possibility" of recurrence, but rather a "demonstrated probability." *Maryland Peoples Counsel*, 761 F.2d at 773 (quoting *Murphy v. Hunt*, 455 U.S. 478, 482, 102 S.Ct. 1181, 1183, 71 L.Ed.2d 353 (1982)). We conclude that there is no demonstrated probability that appellants will in the future be subjected to action similar to that complained of. As many as five speculative events must occur before they would be subjected to the same agency action. First, the Tribal Council must apply for a new contract or grant. Second, in its applications, the Tribal Council would have to misrepresent that it was acting on behalf of the Gay Head Tribe.[1] Third, regardless of this misrepresentation, the Department of Health and Human Services would have to award either a grant or contract. Fourth, the Widdiss Group, through the Tribal Council, must use the federal funds awarded in a manner inconsistent with the award and against appellants' political and legal efforts to gain Tribal leadership. Fifth, despite this misuse of federal funds, the Department of Health and Human Services would have to refuse appellants' request to halt disbursement of funds. Only if these events occur will appellants be subjected to the same action again. Because we view the occurrence of these contingencies as unlikely,

the declaration of rights which appellants seek would be an advisory opinion beyond our jurisdiction. *See Bois v. Marsh*, 801 F.2d 462, 466–67 (D.C.Cir.1986); *James Luterbach Construction Co. v. Adamkus*, 781 F.2d 599, 603–04 (7th Cir.1986); *Gulf Oil Corp. v. Brock*, 778 F.2d 834, 838 (D.C.Cir.1985) (quoting *Preiser v. Newkirk*, 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975)). We hold that appellants' claim against the Department of Health and Human Services is moot; therefore, without reaching the issue whether appellants had standing to sue, we affirm the order of the district court dismissing this claim.

### III

The Department of the Interior has promulgated regulations establishing procedures for federal recognition of American Indian groups as Indian tribes. 25 C.F.R. § 83 (1986). First promulgated in 1978, they allow any Indian group that is not currently acknowledged by the Department of the Interior to apply for federal recognition, thereby qualifying for federal protection, services and benefits. 25 C.F.R. § 83.2. A petition for federal recognition is required as a prerequisite to acknowledgment. *See* 25 C.F.R. §§ 83.5, 83.-7. Pursuant to these procedures, the Tribal Council filed with the Department of the Interior a petition for federal acknowledgment. On June 30, 1986, the Interior announced its proposed finding against federal recognition. 51 Fed. Reg. 23,604 (June 30, 1986). Thereafter, the Interior accepted additional evidence challenging the proposed finding and after reconsidering the matter, issued a notice that the Assistant Secretary of the Interior acknowledged the Tribal Council as an Indian tribe within the meaning of federal law. 52 Fed.Reg. 4193 (Feb. 10, 1987). Appellants, rather than seeking federal recognition, as did the Tribal Council, took the position that the Gay Head Tribe, by authority of the reports

---

**1.** In light of the Department of the Interior's acknowledgment that the Tribal Council exists as an Indian tribe within the meaning of federal law, we are not sure that such an assertion

would be a misrepresentation, but in any event, we leave that determination, initially, to the Interior. *See* Part III *infra*.

filed by Reverend Morse, Colonel McKenney and Mr. Schoolcraft, was already federally recognized. They therefore did not file a petition for federal acknowledgment, but rather sought, in the court below, a declaration ordering the Department of the Interior to add the Gay Head Tribe to the list of federally recognized tribes. The district court dismissed the claim based on appellants' failure to exhaust administrative remedies.

Appellants argue it would be redundant for them to exhaust administrative channels in an attempt to obtain federal recognition because the Gay Heads have already been recognized by the Executive Branch. They note that if the Executive Branch determines that a tribe of Indians is recognized, that decision must be respected by the Judicial Branch. *Citing, United States v. Holliday*, 70 U.S. (3 Wall.) 407, 419, 18 L.Ed.182 (1865); *Tully v. United States*, 32 Ct. Cl. 1, 7–8 (1896); *Graham v. United States*, 30 Ct.Cl. 318, 333 (1895). Relying on this line of authority, they conclude that the Gay Head's recognition is locked in and the court below had a duty to order the Department of the Interior to place the Gay Head Tribe on the list of federally recognized tribes and therefore erred in concluding that exhaustion of administrative remedies was required.

■ The court finds this argument unpersuasive. First, we are not prepared to hold that scholarly compilations of lists of Indian tribes existing in the United States are sufficient to constitute tribal recognition by the Executive Branch, even though the scholarly work was commissioned by the government.[2] *Cf. Holliday*, 70 U.S. at 419 (*treaty* with United States government specifically required tribal relations to continue); *Graham*, 30 Ct. Cl. at 332–34 (courts are bound by Indian nation or tribe recognized by *treaties*); *contra Tully*, 32 Ct. Cl. at 7–8 (court will accept recognition of tribe through report by officials of the government). Second, and more important-

ly, the determination whether these documents adequately support the conclusion that the Gay Heads were federally recognized in the middle of the nineteenth century, or whether other factors support federal recognition, should be made in the first instance by the Department of the Interior since Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations. 25 U.S.C. §§ 2, 9. The purpose of the regulatory scheme set up by the Secretary of the Interior is to determine which Indian groups exist as tribes. 25 C.F.R. § 83.2. That purpose would be frustrated if the Judicial Branch made initial determinations of whether groups have been recognized previously or whether conditions for recognition currently exist.

■ In cases such as this, where Congress has delegated certain initial decisions to the Executive Branch, exhaustion of available administrative remedies is generally a prerequisite to obtaining judicial relief for an actual or threatened injury, provided that the purposes of the exhaustion doctrine are furthered. *E.g., Myers v. Bethlehem Shipbuilding Corp.*, 303 U.S. 41, 50–51, 58 S.Ct. 459, 463, 82 L.Ed. 638 (1938); *Utah Power & Light Co. v. I.C.C.*, 747 F.2d 721, 725 (D.C.Cir.1984); *Andrade v. Lauer*, 729 F.2d 1475, 1484 (D.C.Cir. 1984).

Exhaustion has four primary purposes: First, it carries out the congressional purpose in granting authority to the agency by discouraging the frequent and deliberate flouting of administrative processes [that] could ... encourag[e] people to ignore its procedures. Second, it protects agency autonomy by allowing the agency the opportunity in the first instance to apply its expertise, exercise whatever discretion it may have been granted, and correct its own errors. Third, it aids judicial review by allowing the parties and the agency to develop the

---

2. The one document relied on by appellants actually prepared by a branch of the United States Government, the House of Representatives Committee on Indian Affairs, provides less than persuasive authority for federal recogni-

tion. It merely lists the "Indians of New England" as among those tribes who had not agreed to move west of the Mississippi River; no specific mention of the Gay Heads is made.

facts of the case in the administrative proceeding. Fourth, it promotes judicial economy by avoiding needless repetition of administrative and judicial factfinding, and by perhaps avoiding the necessity of any judicial involvement at all if the parties successfully vindicate their claims before the agency.

*Andrade,* 729 F.2d at 1484 (citations omitted). In this case, requiring exhaustion of the Department of the Interior's procedures for tribal recognition, before permitting judicial involvement, serves these purposes.

Ensuring that the congressional determination that others similarly situated use the administrative procedures to achieve federal recognition is clearly served. As noted, Congress has specifically authorized the Executive Branch to prescribe regulations concerning Indian affairs and relations. Regulations establishing procedures for federal recognition of Indian tribes certainly come within the area of Indian affairs and relations. Further, requiring exhaustion allows the Department of the Interior the opportunity to apply its developed expertise in the area of tribal recognition. The Department of the Interior's Branch of Acknowledgment and Research was established for determining whether groups seeking tribal recognition actually constitute Indian tribes and presumably to determine which tribes have previously obtained federal recognition, *see* 25 C.F.R. § 83.6(b). The Branch staffs two historians, two anthropologists, and two geneological researchers and has evaluated some twenty petitions for federal acknowledgment. It is apparent that the agency should be given the opportunity to apply its expertise prior to judicial involvement. *See Runs After v. United States,* 766 F.2d 347, 351–52 (8th Cir.1985); *contra Mashpee v. New Seabury Corp.,* 592 F.2d 575 (1st Cir. 1979), *cert. denied,* 444 U.S. 866, 100 S.Ct. 138, 62 L.Ed.2d 90 (1979).

In *Mashpee,* a case supporting appellants' position, the court held that the question whether a group of Indians constituted a tribe did not require deference to administrative expertise. *Mashpee,* 592 F.2d at 580–81. The court's reasoning was three-fold. First, it concluded that the facts surrounding the question were not so technical as to be beyond the understanding of judges and juries. Second, the question turned on "adjudicative facts" rather than "legislative policy decisions." Third, the Department of the Interior had not developed a special expertise in the field; at the time of the dispute, the Department had only issued proposed regulations for determining tribal recognition. The court specifically noted however that "once the [Department] finally approved its regulations and developed special expertise ... we might arrive at a different conclusion." *Mashpee,* 592 F.2d at 581.

We believe that the time for a different conclusion has come; the Department has been implementing its regulations for eight years and, as noted, it employs experts in the fields of history, anthropology and geneology, to aid in determining tribal recognition. This, in our opinion, weighs in favor of giving deference to the agency by providing it with the opportunity to apply its expertise. Moreover, the factual record developed at the administrative level would most assuredly aid in judicial review should the parties be unsuccessful in resolving the matter; in the event that the dispute is resolved at the administrative level, judicial economy will be served. All of these facts weigh in favor of requiring exhaustion in this case.

One remaining issue merits discussion. There exist certain exceptions to the exhaustion doctrine, one of which applies where "following the administrative remedy would be futile *because of certainty of an adverse decision." Randolph-Sheppard Vendors of America v. Weinberger,* 795 F.2d 90, 105 (D.C.Cir.1986) (emphasis in original) (quoting 3 K. Davis, *Administrative Law Treatise* § 20.7 (1958)). In this case, the Department of the Interior's acknowledgment of the Tribal Council as an Indian tribe arguably renders the requirement that appellants go before the Interior seeking resolution of the issue of Gay Head acknowledgment futile. That is, if presented with a petition for federal acknowledgment of the Gay Head Tribe, the

Interior could conceivably point to the Tribal Council's recognition as dispositive of the issue; this presumably would require appellants to institute another civil action seeking to overturn the acknowledgment of a hostile tribal faction as the Gay Head Tribe.

■ Resort to administrative remedies is "futile" and adverse action certain, if the denial of relief would result from a prior indication from the agency that it does not have jurisdiction over the matter or it has evidenced a strong position on the issue together with an unwillingness to reconsider. *Randolph-Sheppard*, 795 F.2d at 105–07. These circumstances are not present in the case before us. The Interior certainly recognizes its jurisdiction over the issue of federal recognition; its regulations specifically provide for decisions on these issues. Neither has it expressed a strong position or an unwillingness to reconsider the issue of the Gay Head's acknowledgment. On the contrary, it has demonstrated flexibility on the issue. *Compare* Final Determination of Federal Acknowledgment of the Wampanoag Tribal Council of Gay Head, Inc., 52 Fed.Reg. 4193 (Feb. 10, 1987) *with* Proposed Finding Against Acknowledgment of the Wampanoag Tribal Council of Gay Head, Inc., 51 Fed.Reg. 23,604 (June 30, 1986). Therefore, requiring exhaustion of administrative remedies would not be futile.

For these reasons, the court concludes that the district court was correct in ruling that appellants were required to exhaust administrative channels concerning the issue of tribal recognition prior to seeking judicial review. Accordingly, the order of the district court dismissing the claim against the Department of the Interior is affirmed.

*Affirmed.*