# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued April 7, 2016                    Decided July 19, 2016

No. 15-5118

MACKINAC TRIBE,
APPELLANT

v.

SALLY JEWELL, U.S. SECRETARY OF THE INTERIOR,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:14-cv-00456)

*Michael J. Walleri*, *pro hac vice*, argued the cause for appellant. With him on the briefs was *Ryan C. Posey*.

*Nicholas A. DiMascio*, Trial Attorney, U.S. Department of Justice, argued the cause for appellee. With him on the brief were *John C. Cruden*, Assistant Attorney General, *Mary Gabrielle Sprague*, Attorney, and *Matthew Marinelli*, Attorney.

Before: BROWN, GRIFFITH and PILLARD, *Circuit Judges*.

Opinion for the Court filed PER CURIAM.

Concurring opinion filed by *Circuit Judge* BROWN.

PER CURIAM: Plaintiff-Appellant Mackinac Tribe brought an action in federal district court to compel the Secretary of the Interior to convene an election allowing the Tribe to organize under the Indian Reorganization Act (IRA), 25 U.S.C. § 476(a). Although the Mackinac Tribe does not appear on the Secretary's list of federally acknowledged tribes and has not been acknowledged through the Secretary's Part 83 process, *see* 25 C.F.R. pt. 83, the group alleges it is federally recognized for IRA purposes because it is the historical successor to a tribe the federal government previously recognized via treaty. The district court reserved the question of whether acknowledgment through Part 83 is a necessary prerequisite for tribal organization under the IRA, finding instead that the Mackinac Tribe failed to exhaust its administrative remedies by first seeking acknowledgment through the Part 83 process. We agree and affirm the district court's grant of summary judgment.

# I

To appreciate the Mackinac's claim, we must look far back into our Nation's history. Between 1785 and 1855, the United States entered into numerous treaties with a group of Native Americans known as the Ottawa and Chippewa Nation. These people were located in Michigan and comprised several autonomous tribes linked by similar culture and shared language—of which the Mackinac were one. For ease of administrability, the government referred to and negotiated with these tribes collectively as the "Ottawa and Chippewa Nation of Indians." *See, e.g.*, Treaty with Ottawa and Chippewa, 7 Stat. 491 (Mar. 28, 1836). An 1836 treaty, however, singled out the Mackinac Tribe (then referred to as the Michilimackinac) to create a temporary five-year reservation for its bands. *See id.* Art. 3.

Two decades later, the federal government encountered resistance when it tried to negotiate collectively with this group of bands. The various groups insisted on negotiating independently and further demanded the government dissolve the Ottawa and Chippewa Nation. *See* Treaty with the Ottawa and Chippewa, 11 Stat. 621, Art. 5 (July 31, 1855). As part of an 1855 treaty, the government agreed to dissolve the Nation. *Id.* Relevant to this litigation, the government also purportedly set aside two land withdrawals for the exclusive use of the Mackinac Tribe. Twenty years later, though, the Secretary of the Interior terminated all federal services to the Mackinac.

Most recently, in 2011, several Mackinac groups consolidated to conduct an election under the IRA. To qualify for benefits under the IRA, tribes must meet certain conditions set by federal law. "The most important condition is federal recognition, which is a 'formal political act confirming the tribe's existence as a distinct political society, and institutionalizing the government-to-government relationship between the tribe and the federal government.'" *California Valley Miwok Tribe v. United States*, 515 F.3d 1262, 1263 (D.C. Cir. 2008) (quoting COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 3.02[3], at 138 (2005 ed.)). The definition of "recognition" has evolved over time but historically the United States recognized tribes through treaties, executive orders, and acts of Congress. *See* Harry S. Jackson III, Note, *The Incomplete Loom: Exploring the Checkered Past and Present of American Indian Sovereignty*, 64 RUTGERS L. REV. 471, 478 (2012). In 1871, Congress abolished the practice of treatymaking after several tribes allied themselves with the Confederacy during the Civil War and the military advantage of the treaties declined. *See id.* at 476 & n.28. However, treaties that had been entered into prior to 1871 were still recognized. *See* 25 U.S.C. § 71.

In 1934, Congress codified its treatment of Indian tribes through the IRA. The IRA defines the term "Indian," in part, to "include all persons of Indian descent who are members of any *recognized* Indian tribe now under Federal jurisdiction." 25 U.S.C. § 479 (emphasis added). The Supreme Court has interpreted the phrase "now under Federal jurisdiction" to refer only to tribes that were under federal jurisdiction in 1934—the time of the IRA's enactment. *See Carcieri v. Salazar*, 555 U.S. 379, 382–83 (2009). The Court has not analyzed the meaning of the word "recognized" nor has it determined whether recognition must have existed in 1934.

Recognition by the federal government proceeded in an ad hoc manner, even after the passage of the IRA, with the Bureau of Indian Affairs (BIA) reviewing petitions for federal recognition on a case-by-case basis. *Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 211 (D.C. Cir. 2013). Finally, in 1978, Interior promulgated Part 83 of its regulations under the IRA (also known as the Federal Acknowledgment Process), which set out uniform procedures through which Indian groups could seek formal recognition. A group seeking recognition under Part 83 must submit a petition to Interior documenting certain criteria, including whether it has been identified as an American Indian entity on a "substantially continuous basis" since 1900; whether it comprises a "distinct community;" whether it has historically maintained "political influence or authority over its members;" and whether its membership "consists of individuals who descend from a historical Indian tribe." *See* 25 C.F.R. § 83.11(a)-(c), (e). If a group successfully petitions, it is added to the list of federally recognized Indian tribes published by Interior. *See* 25 U.S.C. § 479a-1.

With respect to tribal organization, the IRA directs: "Any Indian tribe shall have the right to organize for its common

welfare, and may adopt an appropriate constitution and bylaws." 25 U.S.C. § 476(a). In 1981, Interior promulgated specific regulations governing this process in Part 81 of its regulations. *See* 25 C.F.R. pt. 81. Part 81 states, in broad terms, that any Indian tribe "included on" the list of federally recognized tribes *or* "eligible to be included" on that list can call for an election under the IRA.[1] *See* 25 C.F.R. § 81.1(w) (2014). Interior is obligated to hold such an election— assuming the tribe qualifies—within 180 days of receipt of a tribal request. 25 U.S.C. § 476(c)(1)(A). If a majority of the adult members of a tribe vote to ratify the constitution, then Interior must approve the document unless it violates federal law. *Id.* § 476(d)(1).

In August 2011, the Mackinac Tribe submitted a petition for a Part 81 election to the Secretary of Interior. The Secretary refused to conduct the election. The Tribe then brought an action in federal district court seeking declaratory and mandamus relief; specifically, it asked the court to declare it a federally recognized Indian tribe and to order the Secretary to conduct an election under the IRA. The Secretary filed a motion to dismiss, arguing (in relevant part) that the Mackinac were not a federally recognized tribe for IRA purposes because they had not gone through the Part 83 acknowledgment process and therefore had failed to exhaust their administrative remedies. The district court converted the motion to dismiss into a motion for summary judgment and ruled for the Secretary.

---

[1] Notably, while this litigation was pending, Part 81 was amended to alter the definition of a "tribe" for election eligibility purposes. "Tribe" is now defined to mean any tribe "listed in the Federal Register . . . as recognized and receiving services" from BIA. 25 C.F.R. § 81.4. Both parties in their briefing rely on the old Part 81 definition—which was in effect at the time the Mackinac petitioned the Secretary—so we cabin our discussion to the earlier provision.

In doing so, the court below declined to answer whether recognition under Part 83 is a necessary precursor to receiving an election under Part 81. The district court instead found the Tribe had to exhaust its administrative remedies by availing itself of the Part 83 process first. We review *de novo* the district court's grant of summary judgment, *Colbert v. Potter*, 471 F.3d 158, 164 (D.C. Cir. 2006), and we affirm.

## II

The district court applied our closest precedent. In *James v. U.S. Department of Health and Human Services*, we held that, as a matter of prudential exhaustion, a group of Indians seeking to be acknowledged by the Secretary as a federally recognized tribe must first attempt to gain that acknowledgement through the Part 83 process. 824 F.2d 1132, 1136–37 (D.C. Cir. 1987). In *Muwekma Ohlone Tribe v. Salazar*, we followed *James* and made clear that a tribe seeking to be acknowledged by the Secretary must pursue the Part 83 process even if the tribe claims, as the Mackinac Tribe does here, that it has previously been recognized by the federal government. 708 F.3d 209, 218–19 (D.C. Cir. 2013).

The Mackinac Tribe seeks relief different from what the tribes in *James* and *Muwekma Ohlone* sought—a secretarial election under the IRA rather than inclusion on the Secretary's list of federally acknowledged tribes—but the rationale of those cases has persuasive force here as well. The Mackinac Tribe contends that, because it is a recognized tribe, it is eligible for a secretarial election. But no branch of government has determined whether the plaintiff Mackinac Tribe currently qualifies as a recognized tribe or as the tribe that was recognized in 1855.

Our decisions in *James* and *Muwekma Ohlone* teach that, when a court is asked to decide whether a group claiming to be a currently recognized tribe is entitled to be treated as such, the court should for prudential reasons refrain from deciding that question until the Department has received and evaluated a petition under Part 83. *James* gave good reasons for that restraint. Congress delegated to the Secretary the regulation of Indian relations and affairs, *see generally* 25 U.S.C. § 2, including authority to decide in the first instance whether groups have been federally recognized in the past or whether other circumstances support current recognition. *James*, 824 F.2d at 1137. The administrative exhaustion requirement honors that delegation. It also protects the autonomy of the agency that has the expertise to make (and correct) such determinations, preserves judicial resources, and better tees up disputes for eventual judicial review. *See id.* at 1137–38; *see also United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 550 (10th Cir. 2001) (following *James* to conclude that "exhaustion is required when, as here, a plaintiff attempts to bypass the regulatory framework for establishing that an Indian group exists as an Indian tribe."). Those prudential considerations apply to this case.

As the district court did, we reserve the question whether a group must be recognized to be eligible to organize under the IRA and whether that recognition must be marked by the group's appearance on the Secretary's list of federally recognized tribes. In view of that reservation, we must acknowledge that our holding gives us some pause. If federal recognition is *not* a prerequisite to organization, requiring exhaustion via the lengthy and expensive Part 83 process unnecessarily imposes a potentially formidable hurdle on tribes seeking the Secretary's assistance to organize. We decline, however, to order the Secretary to call and conduct an election to ratify the Mackinac Tribe's constitution under

§ 476 of the IRA. We read the Mackinac Tribe's complaint as seeking a writ of mandamus. Mandamus is only available in extraordinary circumstances when the plaintiff has a "clear and indisputable" right, and review by other means is not possible. *Cheney v. U.S. District Court for the District of Columbia*, 542 U.S. 367, 380–81 (2004). Given the interplay of recognition, acknowledgment, and organization, there is some question whether the Mackinac Tribe has a right to a secretarial election. Even assuming the Mackinac Tribe has a "clear and indisputable right," we decline the requested mandamus because review will be possible after the Mackinac Tribe has completed the Part 83 procedure. *See W. Shoshone Bus. Council v. Babbitt*, 1 F.3d 1052, 1059 (10th Cir. 1993).

## III

For the foregoing reasons, the district court's grant of summary judgment is

*Affirmed.*

1

BROWN, Circuit Judge, *concurring*: Patience may be a virtue but there's nothing virtuous about the administrative delays the BIA has routinely forced recognition-seeking Indian tribes to endure. "At present day, a federal acknowledgment petition can be over 100,000 pages long and cost over $5 million to assemble; the BIA estimate time for completion of the review is 30 years." *See* Harry S. Jackson III, Note, *The Incomplete Loom: Exploring the Checkered Past and Present of American Indian Sovereignty*, 64 RUTGERS L. REV. 471, 497 (2012). That means a case worker could start the review process her first day at BIA and retire with her full pension before ever completing it. That's appalling.

The Part 83 process begins when a tribe's governing body submits a letter of intent to the Assistant Secretary of the BIA. The agency then publishes the requisite public notices and begins an administrative file for the tribe—now considered a "petitioner." At this point, it is incumbent on the petitioning tribe "to provide enough historical documentation to satisfy the seven criteria established by [Part 83] to determine if the tribe is a 'political and social community that is descended from a historical tribe.'" *Id.* Answering this question is admittedly a nuanced and time-consuming process, requiring agency expertise. By the end, the administrative record tends to range "in excess of 30,000 pages to over 100,000 pages." Barbara N. Coen, *Tribal Status Decision Making: A Federal Perspective on Acknowledgment*, 37 NEW ENG. L. REV. 491, 495 (2003).

Mindful of the intensity of this task—and the agency's unique capacity for completing it—I agree that exhaustion should be required here, but I do so hesitantly. I believe we would be remiss to treat this as a run-of-the-mill case of administrative exhaustion. Exhaustion might reasonably take

months—maybe years—but certainly not generations. For instance, the resolution of an IRS appeal may take "anywhere from 90 days to a year" depending on facts and circumstances. *What You Can Expect From Appeals?*, IRS (May 23, 2016), https://www.irs.gov/individuals/what-can-you-expect-from-appeals. An individual appealing the termination of her disability benefits can expect that appeal to be decided "in as little as four weeks or as long as twelve weeks." *How Long Does A Social Security Disability or SSI Appeal Take?*, SOC. SEC. DISABILITY RES. CTR., http://www.ssdrc.com/disabilityquestions2-46.html (last viewed July 8, 2016). And in 2015, it took the EEOC, on average, "10 months to investigate a charge." *What You Can Expect After You File A Charge*, EQUAL EMP. OPP. COMM. (last viewed July 8, 2016), https://www.eeoc.gov/employees /process.cfm. Compare this with the Cowlitz Tribe of Washington's experience with the acknowledgment process: the tribe first petitioned the government for recognition in 1975 and only received it in 2000—twenty five years later. *See* Sarah Washburn, Note, *Distinguishing* Carcieri v. Salazar*: Why the Supreme Court Got It Wrong and How Congress and Courts Should Respond to Preserve Tribal and Federal Interests in the IRA's Trust-Land Provisions*, 85 WASH. L. REV. 603, 629 (2010). Requiring exhaustion in this context asks far more of tribes like the Mackinac than it does in our usual administrative cases.[2]

---

[2] It is worth mentioning that "exhaustion is not required when unreasonable administrative delay would render the administrative remedy inadequate." *Sw. Bell Tel. Co. v. FCC*, 138 F.3d 746, 750 (8th Cir. 1998); *see also Gibson v. Berryhill*, 411 U.S. 564, 575 n.14 (1973) (nothing that when administrative remedies are deemed inadequate it is "[m]ost often . . . because of delay by the agency"); *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591–92 (1926) (holding a petitioner "is not required indefinitely to await a decision of the rate-making tribunal before applying to a federal court for

The acknowledgement process also requires tribes to sacrifice more than just time. "Volumes of documentary support are required of petitioners chronicling the genealogy, ethno-history, and political life of the group seeking recognition." Gerald Carr, *Origins and Development of the Mandatory Criteria Within the Federal Acknowledgment Process*, 14 RUTGERS RACE & L. REV. 1 (2013). Indeed, "[t]he creation of the documents alone has been estimated to take between two-and-a-half and five years." Alva C. Mather,

---

equitable relief"). Tribes languishing in the Part 83 process have occasionally sought relief under this "unreasonable delay" doctrine. For instance, in *Muwekma Tribe v. Babbitt*, the district court granted mandamus relief to the Muwekma Tribe—which entered into the Part 83 process in 1989 and had yet to receive a determination as of 2000. 133 F. Supp. 2d 30, 32–33 (D.D.C. 2000). In doing so, the court analyzed the factors we laid out for assessing unreasonable delay in *TRAC v. FCC*, 750 F.2d 70 (D.C. Cir. 1984), and concluded that factors like the decision's slow pace and the nature and extent of the interests prejudiced warranted relief. *See Muwekma Tribe*, 133 F. Supp. 2d at 36–41. It may seem, then, that the Mackinac Tribe could avail itself of this judicial remedy once it enters into the Part 83 process, assuming it experiences a similar delay. However, a more recent case from our circuit calls even that potential avenue for relief into question. In *Mashpee Wampanoag Tribal Council, Inc. v. Norton*, we emphasized that Part 83 delays were "attributable, at least for the most part, to a shortage of resources addressed to an extremely complex and labor-intensive task." 336 F.3d 1094, 1100 (D.C. Cir. 2003). We therefore remanded to the district court to consider whether such "competing priorities" rendered the delay reasonable in context, specifically whether the tribe was being treated differently than others and whether the agency was working on the matter. *See id.* at 1101–02. As the *Mashpee* court noted, a "problem stemm[ing] from a lack of resources" is "a problem for the political branches to work out." *Id.* at 1101. Unfortunately for the Mackinac Tribe, Congress has yet to heed this call.

Comment, *Old Promises: The Judiciary and the Future of Native American Federal Acknowledgment Litigation*, 151 U. PA. L. REV. 1827, 1840 (2003). The burden falls to the tribe to "hire an array of experts: anthropologists to validate the existence of a current tribal community, genealogists to trace tribal ancestry, and lawyers to oversee the process." *Id.* "On average, tribes have paid between $300,000 and $500,000 for the creation of their petition" and some have paid "more than a million dollars for their documentation." *Id.*

Beyond tangible investments like time and money, the process is also emotionally draining. To be acknowledged, tribes must reveal "their members' personal stories and the community's history to a federal agency," with that information then becoming part of the public record. *Id.* at 1141. For some tribes, "disclosing information about their community life violates their traditions and results in considerable emotional loss when this information is revealed to individuals outside the tribe." *Id.* And the passage of time can ultimately preclude a tribe from obtaining necessary documentation, particularly when important tribal leaders "who may have been able to provide necessary first-hand information to federal investigators" die while the tribe's petition is pending. *Id.*

One would hope, given the significant amount of resources required to navigate this bureaucratic morass, that the process itself would at least be sound. But the process has been criticized—including by a Government Accounting Office report—for its "lack of transparency," for the regulations' "vague[ness]," and for the "improper[] influence" that gaming concerns exert on the agency. Roberto Iraola, *The Administrative Tribal Recognition Process and the Courts*, 38 AKRON L. REV. 867, 892–83 (2005). What's more, it seems the vast majority of tribes that were already federally

acknowledged would be unable to meet the current Part 83 standards. *See* Jackson, *supra*, at 507 (noting that, in 2010, the BIA recognized "72% . . . of currently recognized federal tribes could not successfully go through the [Part 83] process as it is being administered today").

Despite my significant concerns about both the length and the integrity of this process, I agree that the Mackinac Tribe must at least try to exhaust its administrative remedies in this context—which is far outside the judiciary's wheelhouse. Still, we are reminded today that Justice Douglas's words ring as true now as they did nearly half a century ago: "The bureaucracy of modern government . . . is slow, lumbering, and oppressive." *Wyman v. James*, 400 U.S. 309, 335 (1971) (Douglas, J., dissenting).